**UNITED STATES of America**

v.

**Walter F. TELLIER, Albert Joseph Proctor, Defendants-Appellants,**

**Elton B. Jones and Alaska Telephone Corporation, Defendants.**

**No. 104, Docket 24665.**

United States Court of Appeals Second Circuit.

Argued December 10, 1957.

Decided May 6, 1958.

See also, 19 F.R.D. 164.

Richard J. Burke, J. Bertram Wegman, New York City, (Saul Gordon, New York City, Frederick Bernays Wiener, Washington, D. C., of counsel), for appellant Tellier.

Colton & Pinkham, New York City, Spencer Pinkham, New York City, for appellant proctor.

Cornelius W. Wickersham, Jr., U. S. Atty., E.D.N.Y., Brooklyn, N. Y. (Paul Windels, Jr., Sp. Asst. U. S. Atty., New York City, Julian Guy Linker, Asst. U. S. Atty., Brooklyn, N. Y.,) for appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

The appellants, Walter F. Tellier and Albert J. Proctor, were tried and convicted upon a thirty-six count indictment charging them with violations of the fraud section of the Securities Act of 1933, 15 U.S.C.A. § 77q(a); with violations of the mail fraud statute, 18 U.S. C. § 1341; and with a conspiracy to violate each of these statutes, 18 U.S.C. § 371. The charges in the indictment arise out of the public sale of four series of debentures during the years 1951 through 1955. Tellier, who received concurrent sentences of four and one-half years on each count and was fined a total of $18,000, does not contest the sufficiency of the evidence against him. He does contend, however, that reversal is required because of allegedly erroneous rulings made by the trial judge during the course of the trial. Specifically, it is claimed that the trial court erred in permitting testimony Tellier alleges was a violation of the attorney-client privilege, and also erred in the following: (1) the admission into evidence of the corporate records of Alaska Telephone Corporation (ATC), (2) the exclusion of evidence pertaining to the financial condition of ATC at the time of trial, (3) the failure of the trial judge to order production of a report made by a government witness, and (4) the failure of the trial judge to give a requested instruction. Proctor, who received suspended concurrent sentences of nine months on each of the counts in the indictment, contests only the sufficiency of the evidence to support the verdicts against him.

ATC was formed in 1948 to acquire and operate independent telephone and electric power systems in Alaska. Among the promoters was the appellant Proctor, who, upon incorporation, was elected a director of the corporation and, in 1951, its secretary. Proctor enlisted the services of the defendant Elton B. Jones, a Seattle attorney, who was also elected a director and became the company's counsel. After its incorporation ATC acquired several telephone exchanges, with approximately 700 subscribers, located in small Alaskan towns. This property was obtained partly for cash and stock, and partly on credit subject to mortgages. The corporation had insufficient funds to meet operating expenses and accruing mortgage obligations, and it was unsuccessful in several attempts to raise the needed capital.

In April 1951, Major William Maxey, the president and general manager of ATC, together with D. Sherman Starr, the vice-president, approached Tellier & Co., a securities firm located in New York City, concerning the possibility of raising needed funds. Tellier & Co. was owned and controlled by the appellant Tellier, who employed between twenty and thirty salesmen to sell over the telephone the securities handled by his firm. When Tellier was approached by the ATC representatives he retained Bernard D. Cahn, an attorney formerly employed by the Securities & Exchange Commission, to represent Tellier & Co. After some

discussion between Tellier and the ATC representatives it was decided to offer for public sale an issue of securities of an amount less than $300,000. The reason for this limitation was SEC Regulation A, the General Exemption Regulation, which exempted from SEC registration certain issues of securities if the aggregate offering price of the issue did not exceed $300,000.[1] At Tellier's suggestion, and over some objection by Cahn and the New York counsel for ATC, it was decided that the securities to be issued were to be convertible twenty year debentures carrying interest at an annual rate of 6% payable monthly. Tellier & Co. agreed to act as best-efforts underwriter for these debentures, labeled "Series A," and to receive therefor 20% of the face amount of the securities sold. In addition, it was to receive expenses in an amount not to exceed $20,000.

Cahn's objection to the sale of debentures, rather than of common stock, was based upon the failure of ATC to prove that it had earning capacity. An unaudited financial statement prepared by ATC representatives disclosed that the corporation had barely passed the break-even point during the years 1948–1950.[2] Nevertheless, the statement was used in the offering circular prepared by Cahn and registered with the SEC. Within several months of issuance all of the debentures, which had been offered at par, were sold by Tellier & Co. Subsequently, an independent accounting firm was hired to audit ATC's books. The audit revealed that the profit figures contained in the Series A offering circular were erroneous; and that, in fact, ATC had been losing money since its incorporation. The total deficit up to 1951 was about $40,000, with the result that ATC was insolvent. In 1951 ATC additionally lost in excess of $45,000. At Cahn's insistence the corrected information was sent out to all those who had purchased debentures.

In the meantime, Maxey and Starr had severed all connections with ATC, and Cahn who at one time had been elected a director of the corporation resigned his directorship. The need for additional capital continued to plague ATC, and Proctor and Jones spoke to Cahn about this. Cahn told them that additional public financing was inadvisable as long as the corporation continued to operate at a loss. At Cahn's suggestion attempts were made to obtain private financing. This project failed. ATC was now in debt to the Government for money withheld from employees' pay for employees' income taxes and for excise taxes which had been collected from subscribers. In addition, ATC had not turned over to Alaska Communications System long distance toll charges due it which had been collected from ATC subscribers. Finally, the trustee under the Series A trust indenture complained that, although sufficient deposits were made with it so as to enable it to make timely payment of the monthly interest charges, the corporation nevertheless was not maintaining a sufficient advance deposit to provide such payments for a six month period as it was required to do by the indenture.

In view of ATC's immediate need of funds and its inability to obtain them through a private financing, Proctor then approached Tellier to arrange additional public financing. Cahn repeated an earlier warning against public financing, but Proctor represented that ATC was reducing its losses, that it had reached the break-even point, and that the last quarter of 1952 would show a profit. Cahn's request for an audit was met with a reply by Proctor that this was not possible because ATC still owed the auditors a large fee. He insisted, however, that the corporation's financial status was considerably improved.

---

1. See 17 Code of Federal Regulations 230.215 to 230.224.

2. The unaudited statements for those years reflected net profits as follows:

| Year | Profit |
|------|--------|
| 1948 | $1,053 |
| 1949 | 4,113 |
| 1950 | 3,784 |

Over Cahn's objection it was then decided that ATC should issue additional debentures; and, to placate Cahn, it was agreed that common stock should also be sold. Cahn acquiesced, but urged upon Proctor and Tellier the importance of the representation that ATC was now operating at a profit. Proctor agreed to supply Cahn with the supporting financial statements, and several months later he did so. An offering circular was prepared by Cahn and Proctor which represented that ATC had reached the break-even point and that "Net proceeds of this issue will be used for expansion and new equipment and for working capital needed to continue operations." Debentures in the face amount of $150,000 were then issued and offered for sale at a 30% discount. These debentures, labeled "Series B," were in form substantially similar to those previously issued except that they matured in ten years rather than twenty. Tellier's underwriting fee was 10% of the face amount plus $10,000 for expenses. Within a month Tellier had sold all of the debentures, though he was unable to sell any substantial percentage of the 40,000 shares of common stock which had been offered at the same time. A later audit revealed that of the $150,000 face amount of these Series B debentures only $9,000 was expended for new equipment, and for working capital.

Then, before another month had passed, the anticipated audit report disclosed that ATC had not made the profit in the last quarter of 1952 that Proctor had represented would be made. In fact, its losses for that quarter were the greatest in its history, and its total loss for the year was nearly $100,000. In addition, contrary to Proctor's optimistic prediction, it lost money during the first quarter of 1953. This audit also showed, as of the date the report was made, that the Government had filed tax liens against substantially all of ATC's property.

So the proceeds of the Series B debentures appear to have benefited ATC no more than did the proceeds of Series A, and another year went by. Then, in December 1953 Proctor wrote Tellier, enclosing a financial statement for the first three quarters of that year, stating that there had "been little, if any, improvement over the previous period." After setting forth the financial difficulties which the company faced, Proctor again represented that "we believe the corporation is currently operating in the black, * * * "[3] and suggested a sale of additional securities so as to "obtain a breathing spell from the bond interest * * * ". Tellier contacted Cahn about the possibility of selling additional debentures. Cahn refused to handle the transaction. He warned Tellier that ATC, with its consistent record of losses, was merely borrowing money as a substitute for earning money and suggested that the sale of new debentures to get money to pay interest on the old debentures might be a criminal fraud which could involve Tellier in "great trouble." Nevertheless, Tellier, Proctor and Jones decided to go ahead and issue additional debentures, this time in the face amount of $270,000. The arrangements for the underwriting and the terms of the debentures were substantially similar to those of Series B. The offering circular prepared in connnection with the sale of these debentures, denominated "Series C," stated that the "Net proceeds of this issue will be used for expansion and new equipment, for working capital needed to continue operations, and to liquidate delinquent taxes." No mention was made of the tax liens that now had been filed by the Government, of any impending mortgage foreclosures, of the necessity of using a substantial portion of the proceeds for meeting delinquent interest prepayment under the Series A and B indentures, nor of the existence of the defaults under the prior debenture issues.

The last one of the Series C debentures was sold approximately two months after the issue was offered. Shortly thereafter, Proctor assumed the presidency of ATC,

---

3. During the year 1953 ATC lost $66,681.18.

and Jones replaced Proctor as Secretary-Treasurer. At Tellier's request Proctor prepared a letter to all the debenture holders which optimistically reported ATC's financial position and informed them that their debentures could be converted into common stock "at a rather substantial premium." The report did not tell the debenture holders, as Tellier was subsequently told by Proctor, that "it was not possible to apply the funds [proceeds of the Series C debentures] as originally allocated." Nor did the report mention the company's insolvency or its continued operating losses. Less than two months after this report was sent out, ATC again went into default on the interest prepayments required to be deposited with the trustee under the Series A, B and C indentures. Also, by this time, the proceeds of the Series C issue were exhausted. Consequently, Proctor came to New York in October 1954 to arrange with Tellier for the issuance of a fourth series of debentures. So "Series D" came into being, consisting of ten-year, 6% convertible debentures in a total face amount of $158,000, interest payable monthly with the same prepayment deposit provisions as in Series A, B, and C. The offering circular for this series again stated that "Net proceeds of this issue will be used for expansion and new equipment, for working capital needed to continue operations, and to liquidate delinquent taxes." The circular did not mention, however, that a large portion of the proceeds of the issue were already committed to be deposited with the indenture trustee for interest prepayments required to be so deposited by the terms of all four indentures, and also were committed to pay the trustee its fees and expenses. The offering price of a $100 Series D debenture was $70, and although sales resistance was somewhat greater to this issue, within seven months Tellier had been able to dispose of practically all of this issue, also. ATC continued to lose money, as it had in every year of its existence. Finally, in the autumn of 1955, it filed under Chapter XI of the Bankruptcy Act. In November 1955 a receiver was appointed for the corporation by the United States District Court for the Western District of Washington. Later that month ATC filed an amended petition under Chapter X of the Bankruptcy Act and the receiver was appointed Trustee in Bankruptcy.

## I.

The chief witness for the Government was Cahn, Tellier's one-time attorney and one-time director of ATC. Cahn testified to numerous conversations and communications between Tellier, Proctor, Jones, himself and others. With one exception this testimony was admitted without objection by Tellier. The lone objection related to the telephone conversation between Cahn and Tellier in December 1953 in which Cahn warned Tellier against the proposed issuance of a third series of debentures. Tellier urges that this conversation, unlike the others to which Cahn testified, was intended as a confidential communication between an attorney and his client concerning the legal affairs of the client. Hence he contends reversible error was committed by the admission of this testimony into evidence. Proper evaluation of Tellier's position requires that we detail with greater specificity the circumstances relating to the conversation objected to.

On December 7, 1953 Proctor wrote Tellier outlining ATC's precarious financial position. He urged upon Tellier the necessity for obtaining additional funds and suggested another public sale of securities. Tellier, after reading Proctor's letter, sent it to Cahn with the following notation:

"Berney, see if we can put out more bonds. W.F.T."

And then under that is another notation:

"Another one hundred fifty thousand issue to net them ninety should do the trick or maybe two hundred thousand dollar issue. The common don't sell so it can be withdrawn or let die."

"W.F.T."

Upon receiving the letter, Cahn immediately telephoned Tellier, and warned him not to go ahead with any additional public offerings for to do so would involve him in "great trouble." He pointed out that Proctor's letter proposed to use the proceeds of the new issue for the same purposes that the Series B offering circular represented that the proceeds of Series B were to be used for, that the representation made in the Series B circular that ATC had reached the break-even point had proven false, that ATC was selling debentures as a substitute for earning money, and that "this selling of bonds to pay back interest by the sale of new bonds will involve you in a Ponzi scheme." Cahn concluded the conversation by informing Tellier that he would write a letter to Tellier, with copies for Proctor and Jones, substantially setting forth the telephone conversation and pointing out that for legal reasons there should not be any public sales at this time. Cahn prepared the letter, with copies, and sent the letter and copies to Tellier. There is some conflict in the record with respect to whether Tellier ever forwarded the copies so received by him to Proctor and Jones. In any event Tellier wrote Jones on the same day that he had talked to Cahn that

> "Bernie Cahn does not believe it would be possible for you to get a filing through the S.E.C. at this time."

■ ■ It is of the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential. "The moment confidence ceases," said Lord Eldon, "privilege ceases." Parkhurst v. Lowten, 2 Swanst. 194, 216 (1819). Consult 8 Wigmore on Evidence §§ 2311–2316 (3rd ed. 1940). Thus it is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others. In re Fisher, D.C.S.D.N.Y.1931, 51 F.2d 424; Wilcoxon v. United States,

10 Cir., 1956, 231 F.2d 384, certiorari denied 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469; United States v. Shibley, D.C.S.D. Cal.1953, 112 F.Supp. 734.

■ We conclude that Cahn's advice to Tellier was not privileged from disclosure at the trial, for, under the circumstances presented in the record, it is clear that this advice was not understood by either Cahn or Tellier to be confidential. The evidence establishes that Tellier expected Cahn to prepare a letter which was to set forth Cahn's objections to the issuance of additional debentures and which was to be forwarded to Proctor and Jones for their enlightenment. The letter which Cahn did in fact prepare and which was admitted into evidence without objection, is further evidence that Cahn and Tellier understood that the substance of their telephone conversation was to be communicated to Proctor and Jones. That letter recited the substance of what Cahn had told Tellier in the telephone conversation, *i.e.*, that certain statements made in the Series B offering circular had proven false, that Proctor proposed to use the proceeds of the new issuance for the same purposes as the Series B proceeds were to have been used for, and that on the basis of several additional factors Cahn had "some trouble understanding how we can hold out any basis for the public to invest in more debentures." The letter contained Cahn's ultimate conclusion, as he had previously informed Tellier, that the proposed issuance raised "very serious legal problems" and that neither he nor Tellier "should participate in any further debenture financing for the Company, at least under present circumstances."

The fact that the copies of this letter prepared for them may never have been sent by Tellier to Proctor and Jones is of no relevance. The fact that it was prepared demonstrates the understanding which Cahn and Tellier had as to the confidentialness of the prior telephone conversation. Nor do we attach any significance to the fact that Cahn's letter did not refer to the proposed issuance

as constituting a "Ponzi scheme," a phrase Cahn used in the telephone talk. That Cahn chose to couch his letter in more formal language than he used during his telephone conversation with Tellier does not indicate that some portion of the conversation was understood by the parties to be confidential, for the privilege attaches to the substance of a communication and not to the particular words used to express the communication's content. Moreover, where, as here, information is given and it is agreed that it is to be transmitted to a third party, then not only the specific information, but the more detailed circumstances relating to it are subject to disclosure. United States v. Shibley, supra. Thus, assuming that Cahn's oral warning of a "Ponzi scheme" had not been intended to be communicated further, even then it was not a privileged communication. It was too closely connected with the information which was intended to be communicated to Proctor and Jones to be severed from the entire subject matter of which it was contemplated that Proctor and Jones were to be informed.

We conclude that the trial judge properly admitted Cahn's testimony concerning the telephone conversation between Tellier and him.

## II

Tellier next assigns as error the admission into evidence of the books and records of ATC. These exhibits were admitted during the testimony of the Government's witness Casagrande who had prepared several schedules tracing the proceeds of the debenture sales. Counsel for Tellier objected to the Government's attempt to place these schedules in evidence on the ground that the books and records from which they had been taken were not in evidence. The Government's offer to place the underlying books and records in evidence was met with the objection that they had not been shown to have been kept in the regular course of business as required by 28 U.S.C. § 1732. The trial judge overruled the objection and admitted the books and records into evidence.

An examination of the record indicates that there was indeed insufficient competent evidence to establish that the books and records were kept in the ordinary course of business. Nevertheless, they were admissible under the rule laid down by this court in United States v. Feinberg, 2 Cir., 1944, 140 F.2d 592, 596, 154 A.L.R. 272, certiorari denied 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562, where we held that if the defendant has made representations concerning the financial condition of a corporation, the books of that corporation are competent as evidence against him in a mail fraud prosecution. In Feinberg the authenticity of the corporate books and records was foreclosed. In the present case, however, Tellier, while not questioning the authenticity of the books and records introduced into evidence as those of ATC, urges that authenticity has not been established by competent evidence. Hence, he contends, they were not admissible even under the Feinberg rule. Tellier's contention appears to be based upon the assumption that the authenticity of the records was for the court to determine and, consequently, that they were inadmissible until the Government had established authenticity by competent proof. This assumption is erroneous. The issue of authenticity was for the jury once a *prima facie* case had been made by the Government. 7 Wigmore on Evidence § 2135 (3rd ed. 1940); Model Code of Evidence, Rule 601(a) (1942).

Consequently, we need only determine whether there was sufficient evidence of authenticity to make out a *prima facie* case for the genuineness of the documents. We have no hesitation in holding that there was. Some of the documents were identified by ATC's bookkeeper as being the records of the corporation. In addition, Casagrande's testimony was sufficient evidence from which the jury might have found that the books and records were authentic. Casagrande could not, of course, testify as to genuineness as did ATC's bookkeeper, from first hand knowledge. He could and did, however, testify of his own knowl-

edge that the books and records purported to be those of ATC, that they were records which as an accountant he was accustomed to seeing kept by a corporation, and that the books and records were found by him at the office of the corporation. Clearly, the testimony of ATC's bookkeeper and Casagrande was sufficient to sustain a finding of the authenticity of the books and records introduced by the Government. Consequently, the trial judge correctly ruled as to the admissibility of these documents.

### III

The indictment charged Tellier and his co-defendants with having defrauded the purchasers of the Series A, B, C, and D debentures " * * * by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made in the light of the circumstances under which they were made not misleading * * * ". At the trial evidence was proffered by the defendants bearing upon the financial condition of ATC during the years 1956 and 1957, after it was in the hands of a trustee in bankruptcy. This evidence was excluded by the trial judge on the grounds of irrelevancy, and these rulings are now urged by Tellier as constituting error requiring reversal.

■ We cannot agree. To begin with, the gist of the charges against the defendants was not, as Tellier suggests, that they falsely represented that ATC would eventually be prosperous. The tenor of the false representations charged were the statements and omissions concerning the current condition of the corporation. The falsity of these representations and the misleading effect of the omissions could not be altered by proof that ATC was operating at a profit at the time of trial, or that rate increases had been granted at some time after the defendants had relinquished control to a trustee in bankruptcy. Similarly, Tellier's belief in the eventual prosperity of the corporation could not serve to lessen the culpability of his conduct.

Even more important, however, is the fact that in November of 1955 ATC was placed in the hands of a trustee in bankruptcy, and, in reorganization, the corporation was operating under such radically altered conditions that it was in effect a different entity than that which it had been when the representations were made. It was not operating with the overwhelming burden of payments for debt-service which had so plagued it previously. No possible purpose could have been served by admitting evidence of the corporation's financial position during 1956 and 1957.

### IV

■ The remaining issues raised by Tellier need not detain us long, for they are clearly without merit. On cross-examination by Tellier's counsel, a witness for the prosecution referred to memoranda which the witness had prepared. Tellier's counsel inquired whether these memoranda were available, to which the witness replied that they were. Tellier's counsel did not, however, request that the memoranda be made available to him. Under the circumstances, Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, now modified by 18 U.S.C. § 3500, does not require reversal.

Nor is reversal required by the refusal of the trial judge to give the jury the following instruction Tellier requested:

> "While it is your duty to confer with your fellow jurors and discuss the evidence with them, your verdict must represent the real judgment and honest conclusion of each of you, and I charge you that each of you has the duty of arriving at your conclusions separately and that no one of you may surrender his earnest belief, if based upon the evidence, merely for the purpose of preventing a disagreement."

■ ■ This charge, insofar as it informs the jury that "each of you has the duty of arriving at your conclusions separately," is not a correct statement

of the law. As the Supreme Court indicated in Allen v. United States, 1896, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528, the jury's verdict is to be reached in concert. See also, Papadakis v. United States, 9 Cir., 1953, 208 F.2d 945. An individual juror has a duty not only to confer with his fellow jurors and to discuss the evidence with them, but also to approach the jury deliberations with a willingness to recognize the validity of each juror's opinion. Tellier's requested instruction is erroneous because it fails to convey this latter point. It might well be interpreted by a juror as an invitation to adhere to his own approach to the case and merely to go through the form of listening to the views of his fellow jurors. In any event, even if the requested instruction had been unexceptionably phrased, we think that the propriety of charging it was within the discretion of the trial court. Although an instruction somewhat similar to that requested by Tellier has occasionally been given as part of the charge-in-chief, see, *e.g.*, the court's charge in United States v. Reid, D.C.D. Del.1913, 210 F. 486, at page 494, and United States v. Kenney, C.C.D.Del.1898, 90 F. 257 at page 274, it would appear that it more customarily has been given as a supplemental charge after the jury has reported tentative disagreement and has been instructed that it is a jury's duty to reach a verdict if they are capable of conscientiously doing so.[4] Where, as here, there is an absence of circumstances indicating that such an instruction would be helpful to the jury, the decision of whether or not it should be given is within the discretion of the trial judge. We have no reason to doubt that he exercised that discretion wisely.

## V

■ We turn next to the evidence bearing upon the guilt of the appellant Proctor. An examination of the record indicates that the evidence against him is clearly sufficient to sustain the verdict of guilty. Proctor's attack upon the evidence is two-pronged. He contends first that the evidence does not warrant a jury finding that the offering circulars mailed to purchasers of the debentures were misleading. He also urges that there is insufficient evidence to justify a jury finding that he participated in and had knowledge of the fraud that was perpetrated upon the public.

The first of Proctor's contentions is frivolous, as appears from even a cursory reading of the record. The material misstatements of fact in the circulars, as well as the failure to disclose material facts that should have been disclosed, were misrepresentations of precisely the kind it is the purpose of the fraud statutes to protect the public against. And there was adequate evidence from which the jury could find that Proctor's knowledge of and participation in the fraud were proven beyond a reasonable doubt. Proctor was one of the founders of ATC, and, together with the defendant Jones whom he brought into the corporation, he controlled it from 1951 until 1955 when the bankruptcy petition was filed. As secretary of the corporation, and later as its president, he was the main link in communication between ATC and Tellier during all times relevant to the issuance and sales of the Series B, C and D debentures. Whether or not Proctor was aware of the high pressure tactics employed by Tellier to sell the debentures,[5] the active role which Proctor played in the affairs of the corporation surely justified the jury in believing that he was aware of the fraud perpetrated upon the purchasers of the debentures.

To be sure, Proctor never sold any of the debentures, and the jury was so charged. Nevertheless, his participation

---

4. See Allen v. United States, supra; Orton v. United States, 4 Cir., 1955, 221 F. 2d 632; Wolin v. United States, 4 Cir., 1954, 211 F.2d 770; United States v. Samuel Dunkel & Co., 2 Cir., 1949, 173 F.2d 506.

5. Since Tellier does not maintain that there was insufficient evidence to convict him, we have not dealt at any length in this opinion with his activities but have limited ourselves to discussing his claims of specific error.

in the fraud was convincingly established. It was Proctor's representation that ATC had reached the break-even point and that it had made a profit in the last quarter of 1952 which paved the way for the issuance of the Series B debentures. In view of repeated and insistent warnings by Cahn about the necessity that ATC be operating at a profit before these additional debentures were sold to the public, it cannot be successfully maintained that Proctor was unaware of the materiality of this representation, or of the materiality of the similar representation which he made prior to the issuance of the Series C debentures. Proctor's active role in the fraud is further demonstrated by the letter which he sent out to all debenture holders on August 23, 1954 informing them that they could convert their holdings into stock at a "rather substantial premium." Proctor seeks to avoid the damaging effect of this letter on the ground that the record discloses that none of the recipients of this letter exercised their conversion rights. It was, however, permissible for the jury to find that the purpose of the letter was to pave the way for the sale of the Series D debentures which the public did buy. The reasonableness of this inference appears from the fact that Proctor's letter was written approximately two months after Tellier had written Proctor in June 1954, "Better start building those Bondholders *now* & every month from now on for the next issue," and arrangements for the "next issue," Series D, were initiated approximately two months after Proctor's letter was sent out.

We think it is unnecessary to recite the evidence against Proctor in further detail. The evidence which we have discussed and additional evidence in the record is wholly consistent with the jury's verdict that Proctor knowingly participated in a scheme whereby the public was fraudulently induced to invest over $700,000 in the debentures of an insolvent corporation which at no time during its history operated at a profit.

## VI

We conclude that the trial of the appellant Tellier was free of error and that there was sufficient evidence to sustain the verdicts against him and the appellant Proctor. The judgment below is affirmed.

LUMBARD, Circuit Judge (dissenting).

I dissent and vote to reverse Tellier's conviction as I cannot agree with Judge WATERMAN's conclusion that Cahn's "Ponzi scheme" warning to Tellier was properly admitted on the ground that Cahn's advice to Tellier was not understood to be confidential.

On the contrary, from the tone and content of the letter which Cahn immediately afterwards wrote to Tellier, for the purpose of forwarding to Proctor and Jones, it seems to me that the parties understood that what would be disclosed to them would be couched in terms of what was inadvisable rather than what might be fraudulent and criminal. The occasion required plain speaking by Cahn and he spoke to Tellier in terms which would be clearly understood by one in the business of selling securities. When he said that further selling of bonds would "involve [Tellier] in a Ponzi scheme" he was in effect saying that if he did this he could go to jail as Ponzi did.

Such a blunt warning is precisely the kind of advice that an attorney should give to a client who hovers on the brink of questionable financial practices. But from the very nature of the occasion which requires such a warning, it is well understood that it is the kind of speaking which usually does not take place before third persons and which is not intended for other ears or eyes. The majority opinion means that an attorney by his very act of warning a client against imprudent and unlawful action is placing himself in the position of principal witness against the client he seeks to aid. 8 Wigmore on Evidence § 2291, p. 550 (3d Ed. 1940).

If in these circumstances the attorney can be made to disclose what he said, it follows an attorney will not dare to speak bluntly and forthrightly to his client and much good that may flow from the confidential nature of the relationship will be lost. *Cf.* 34 Neb.L.R. 538, 540 (1955).

Thus it seems to me that the reasoning of the majority sucks all the vitality and usefulness from the attorney-client privilege; it whittles the privilege to nothing and, worse still, it makes the attorney a witness against his client.

There is a great public interest in preserving this relationship and encouraging a frank exchange between attorney and client. In the overwhelming majority of cases the client follows the attorney's advice. Obviously frank expression of opinion, including such simile, metaphor and emphasis as seems appropriate, increases the likelihood that the attorney's advice will be heeded by the client. Any diminution of the protection which withdraws the veil of secrecy, where it is not crystal clear and explicit that both attorney and client understand that the very words of a private conversation are to be communicated to others, defeats the salutary purpose of the privilege.

Here it is abundantly clear that what was to be communicated to Proctor and Jones was to be a watered-down version couched in lawyer-like language. The letter did not say that issuing Series C debentures would be fraudulent and criminal; it merely pointed out that further issuance of similar debentures was highly inadvisable and unwarranted unless and until certain questions could be answered.

Cahn first related his telephone talk with Tellier on December 17 or 18, 1953. He advised Tellier not to become involved in the issue of a new series of bonds for the Alaska Telephone Corporation, since " * * * Alaska * * * is selling bonds to stay alive, to keep going, as a substitute for earning money." Cahn said he warned Tellier in these words: "On that basis, if you sell bonds, you are merely selling additional bonds instead of having the company make money. And this selling of bonds to pay back interest by the sale of new bonds will involve you in a Ponzi scheme."

This forceful language is a far cry from the detailed lawyer-like letter which Cahn sent to Tellier, dated December 23, 1953, and which may be quoted in part as follows:

"Dear Walter:

"This will acknowledge receipt from you of the letter from Bert Proctor of Alaska Telephone Corporation dated December 7th requesting assistance in the current emergency confronting the company.

\*　\*　\*　\*　\*　\*

"In your accompanying note you indicate that you will be unable to sell any common stock and inquire whether the company can issue some more debentures, in the maximum principal amount of $150,000, to $200,000.

*"I am strongly of the opinion that it is unsound for this company to sell any more bonds.*

"The company has demonstrated no ability whatsoever to earn anything, and in fact has sustained a startingly consistent record of losses since its inception. Under the circumstances, *I think there are very serious legal problems as well as practical financial problems involved in selling any more debentures.*

\*　\*　\*　\*　\*　\*

*"In any event, I feel very strongly that neither of us should participate in any further debenture financing for the company, at least under present circumstances.*

\*　\*　\*　\*　\*　\*

"In the event that you should write to Proctor and Jones, there are some questions which I think must be cleared up before we can even consider going ahead. As an example, I suggest that some of the following questions must be answered:" (The letter then listed five matters which required explanation or reconciliation.)

\*　\*　\*　\*　\*　\*

"Nothing that I say is intended as a reflection in any way on Jones, Proctor or the other officers. I know they have done all they can. This is a tough situation. *However, there is not enough in the picture to justify any further debenture sales.* As I stated above, I think this is the time for the company to raise private capital to take it over its current difficulties. Public capital should await a demonstration of the company's earning power. *When I was in Seattle last March, I told Proctor and Jones that, in my opinion, no further public financing was possible under any circumstances unless and until the company demonstrated earning power. I still feel the same way.*

"Best regards, sincerely."
(Emphasis added.)

While it may seem to be merely a matter of degree, the difference between the talk and the letter is of the essence. It is the difference between a warning against felonious conduct and measures which would raise "very serious legal problems," *i. e.* responsibility measured by a jail term rather than by dollars.

Cahn's letter was to take Tellier "off the hook," *i. e.* to give lawyer's reasons why the debentures should not be issued; it was not intended to be and it was not a warning to desist because of possible criminal prosecution. But in any event it was not intended to convey and it did not convey, the blunt prophetic language of the Cahn-Tellier telephone talk. Obviously it would serve no purpose, either of Tellier or Cahn, to pass along Cahn's colorful characterization of a further issue as a "Ponzi scheme." That he did not put "Ponzi scheme" or any intimation of possible criminal consequences in the letter seems to me to be conclusive proof of that.

The mere fact that some conclusions of the attorney-client exchange are to be conveyed to others is not an excuse or a reason for saying that the parties did not intend any part of the exchange to be confidential. Such reasoning is contrary to the facts of life and to the implicit nature of man-to-man speaking;

it eats the heart out of the attorney-client relationship. The privilege of the attorney-client relationship attaches to the particular words used or it is no privilege at all.

The majority opinion makes the further argument that even if Cahn's "Ponzi scheme" warning had not been intended to be communicated further, nevertheless it was not privileged because what Cahn said to Tellier "was too closely connected with the information which was intended to be communicated to Proctor and Jones" to be severed from that concerning which they were to be informed.

Few talks between attorney and client could ever survive such a test. How could it ever be said that the connection was not a close one? It makes no difference how close the connection might be, what is said privately should be protected unless the client clearly consents to further communication. See Connecticut Mutual Life Insurance Co. v. Shields, D.C.S.D.N.Y.1955, 18 F.R.D. 448, 451; New York Civil Practice Act, § 354; People v. Patrick, 1905, 182 N.Y. 131, 175, 74 N.E. 843; Richardson on Evidence § 436 (8 Ed., Prince, 1955). Here, where a letter in writing followed the talk, that seems to me, absent further proof, to be confirmation that the client never intended or consented to further communication of the talk, other than as contained in the letter, and that the attorney so understood it.

If the admission of the evidence was error, I think it follows that it was so harmful to Tellier's defense that his conviction should be reversed. Whatever doubts the jury may have entertained (the first trial had resulted in a hung jury), may well have been resolved by the "Ponzi scheme" talk. The fact that Tellier's own lawyer gave so unequivocal and memorable a warning of what Tellier would be doing if he persisted with more such financing on the basis of such representations as were made in view of the facts known to him can hardly be said to be merely cumulative even in so lengthy a trial with its abundant evidence to support the verdict. I would reverse Tellier's conviction.