Dr. Arthur K. SOLOMON, Plaintiff,

v.

SCIENTIFIC AMERICAN, INC. and
Gerard Piel, Defendants.

No. 87 Civ. 4591 (MJL).

United States District Court,
S.D. New York.

May 19, 1988.

Kevin Yourman, Law Offices of Curtis V. Trinko, New York City, for plaintiff.

James W. Rayhill, Carter, Ledyard & Milburn, New York City, for Scientific American, Inc.

Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton, New York City, for Gerard Piel.

## OPINION AND ORDER

BARBARA A. LEE, United States Magistrate:

This is an action for securities fraud based on oral misrepresentations. Defendant Gerard Piel moves to compel production of a memorandum prepared by plaintiff for one of his attorneys prior to the commencement of this action, which plaintiff identified in response to Piel's Rule 34 request, but withheld on grounds of attorney-client privilege. The motion is denied.

## BACKGROUND

Plaintiff Dr. Arthur K. Solomon held approximately 1% of the outstanding shares of defendant Scientific American, Inc. (SAI), a privately-held company which, among other businesses, published the magazine *Scientific American.* On Janu-

ary 28, 1986, a meeting took place between Solomon and Piel, who was chairman and a principal shareholder of SAI. What occurred at that meeting is at the heart of this case, and will apparently be a key issue of fact at trial. Plaintiff contends that Piel represented to him that SAI would not be sold within the next five years; that the company was doing badly; and specifically that "[i]n 1985, the Company lost money." He alleges that Piel told him of a prospective purchaser, whom Piel declined to identify, who would pay $85 per share for Solomon's 1% interest; and that, in reliance on Piel's statements concerning SAI's financial condition and future prospects, Solomon in fact sold his interest at $85 per share on February 1, 1986, to the unidentified purchaser. Piel contends that he told Solomon it was *the magazine* that was losing money and had been unprofitable in 1985, rather than "the Company" (SAI), which he contends was profitable because of the successful performance of its other businesses.[1]

On June 30, 1986, SAI agreed to be acquired by a West German company. The transaction took the form of a cash-out merger at a price of $258 per share to SAI shareholders. Plaintiff contends that the acquisition resulted from the efforts of an investment banker hired by SAI for that purpose in March, 1986, or "approximately one month" after the January 28 meeting between Solomon and Piel. Financial information disclosed to SAI shareholders in connection with approval of the merger disclosed, among other things, that SAI had earned a profit in 1985.

Shortly after learning of the proposed SAI merger, Solomon consulted a Boston attorney and long-time friend, John Gilmore, about his rights against SAI. After an initial conversation in a social setting, Solomon on July 10, 1986, composed on his word processor a memorandum summarizing his recollection of the events that had taken place, which he then transmitted to Gilmore. Gilmore wrote a letter to Piel,

which after being reviewed by Solomon was sent on July 15, 1986.

Gilmore's letter took the position that "when Dr. Solomon sold his shares, he had not been informed of all the material facts and was affirmatively mislead [*sic*] as to some crucial information" and invited Piel to respond through counsel "[i]f there is any interest on your part in discussing a resolution of this dispute." In support of the argument that Solomon was deceived, Gilmore summarized the January 28 meeting between Solomon and Piel as follows:

I understand that in the course of this conversation you told Dr. Solomon, among other things, that there was no intent to sell the magazine within the next five to ten years; that the magazine had done very poorly in 1985; that the magazine did not expect to reach significant profitability again in the near future; and that Dr. Solomon should not expect any significant financial return on his investment for some time. Given the relationship of trust and confidence that existed between you and Dr. Solomon and your positions as director and chairman of the board of the magazine, Dr. Solomon relied completely on what you told him.

There is no mention in Gilmore's letter of Solomon's July 10 memorandum to him, but both counsel briefed and argued this motion on the assumption that that memorandum was the source of Gilmore's "understanding" of the facts recited. Solomon thereafter retained New York counsel, who filed the complaint herein, alleging that Piel made the representations, above summarized, concerning "the Company" (SAI) during the January 28 meeting. Upon plaintiff's deposition, Piel's attorney attempted to question him about the distinction between the allegation of the complaint that Piel had said "the Company" had lost money in 1985 and the statement in Gilmore's letter "that ... you told Dr. Solomon ... that *the magazine* had done very poorly in 1985" (emphasis added). After an extended colloquy in which

---

1. Although Piel's version of the January 28 conversation does not form part of the record on this motion, his brief includes a representation of what his testimony will be at trial.

counsel argued over whether Gilmore's statement could be attributed to Solomon, the witness volunteered that "they are both true, both of the above."

## DISCUSSION

Defendant Piel argues that the allegations of the complaint are inconsistent with the statements in the Gilmore letter, and that the July 10 memorandum bears directly on plaintiff's credibility. He contends that the memorandum was not privileged because it was not intended as a confidential communication; or alternatively that the privilege was waived. Neither of these arguments is supported by the record in this case.

*Confidentiality*

It is axiomatic that the attorney-client privilege attaches only to confidential communications between attorney and client relating to legal advice. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1036 (2d Cir.1984); *Colton v. United States,* 306 F.2d 633, 637 (2d Cir.1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). The purpose of shielding such confidential communications from disclosure is to encourage full and frank communication between attorneys and their clients in order to enable attorneys to give sound legal advice. *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d at 1036; *see also* 8 J. Wigmore, *Evidence* Sec. 2291 (McNaughton rev. ed. 1961), *quoted in Colton v. United States,* 306 F.2d at 636. Whether the communication was intended to be confidential is to be determined from the circumstances. *See United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.), *cert. denied,* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62

(1958); *McCormick on Evidence* Sec. 91 (E. Cleary 3d ed. 1984).

Movant argues that the privilege never attached to the July 10 memorandum because (1) Solomon never intended it to be a confidential communication; and (2) Solomon knew that Gilmore would use its "contents"—*i.e.,* the facts stated—as the basis for a letter to Piel, and Gilmore in fact did so.

 The party asserting the privilege has the burden of establishing that the communication was intended to be confidential, *In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973), and I find that plaintiff has met that burden. Plaintiff's deposition testimony described the initial social conversation, in which he expressed anger over the SAI merger and "asked John [Gilmore], since I knew that this was an area in which he had [an] interest for Hill & Barlow, whether there was anything that might be done." Plaintiff prepared the memorandum "within a few weeks" and sent it to Gilmore "to turn what had been essentially conversations into a document in which there were written things which I thought represented, to the best of my memory at that time, the events that had taken place." In these circumstances, it is clear that the memo was intended as the equivalent of an "intake interview," to apprise the lawyer of everything the client knew while it was fresh in his memory, as a basis for decision and action in furtherance of his rights.

This inference is not overcome by Solomon's inability to give a yes or no answer to deposition questions concerning his conscious intent. He gave a lay person's description of his state of mind; that he did not expressly refer to confidential intent in the precise terms adverse counsel seemed to consider necessary is not determinative.[2]

---

**2.** The burden of a party claiming privilege cannot in any event be "discharged by mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena Dated January 4, 1984,* 750 F.2d 223, 225 (2d Cir.1984) (quoting *In re Bonanno,* 344 F.2d 830, 833 (2d Cir.1965)). I therefore attach no weight to the conclusory assertion in plaintiff's affidavit in opposition to this motion that

he "gave the written account to Mr. Gilmore in confidence for the purpose of obtaining legal advice," nor to the almost identical language in the affidavit of John A. Gilmore. Both affidavits were obviously drafted by counsel after this dispute arose; neither casts any light on the underlying facts which determine whether that conclusion can be drawn.

Lay witnesses are seldom able to describe their specific intent in the conclusory terminology of applicable legal principles; conduct is a more reliable guide to intent and plaintiff's conduct was that of a client seeking confidential legal advice.

Movant's contention that plaintiff knew Gilmore would "incorporate the contents" of the memo in a letter to the adversary is consistent with plaintiff's confidential intent. Movant does not argue that the July 10 memorandum itself was ever intended to be disclosed, in whole or in part, and in fact the Gilmore letter does not disclose the existence of the July 10 memorandum or refer to any sources for the facts stated. It is the communication which is privileged, not the underlying facts of the transaction. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1037. Thus, although a client may not be questioned about what he told his attorney, he may be questioned about what he knows. *Upjohn Co. v. United States*, 449 U.S. at 395–96, 101 S.Ct. at 685–86. Conversely, just as facts cannot be invested with privilege merely by communicating them to an attorney, *id.* at 396, 101 S.Ct. at 686; *Colton v. United States*, 306 F.2d at 639, so the confidentiality of the communication is not destroyed by disclosure of the underlying facts. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1037.

In *Grand Jury*, a subpoena called for documents relating to a foreign corporation's sale of its American subsidiary, including requests for tax advice concerning alternative forms of employee compensation plans and drafts of documents to be distributed to the employees. The Court of Appeals for the Second Circuit sustained a claim of privilege and found "no indication that confidentiality was not intended" even though

> ... some of the documents appear to be drafts of communications the final version of which might eventually be sent to other persons, and as distributed would

not be privileged, we see no basis in the record for inferring that AG did not intend that the drafts—which reflect its confidential requests for legal advice and were not distributed—to be confidential.

731 F.2d at 1037. That decision is controlling here. Thus, even if the July 10 memorandum were to be viewed as a "draft" of Gilmore's non-privileged letter to the adversary (an inference more favorable to movant than the record warrants), that alone would not destroy the confidentiality of the memorandum.

*United States v. Tellier*, relied on by movant, involved disclosure of the actual confidential communication, not merely the facts communicated: there was a clear understanding between attorney and client that copies of the attorney's letter *to the client* advising as to the illegality of a contemplated transaction would be sent to the client's business associates. *Tellier*, 255 F.2d at 447. To the extent that *Gilhuly v. Johns–Manville Corp.*, 100 F.R.D. 752 (D.Conn.1983), also relied on by movant, is inconsistent with the Second Circuit's later decision in *Grand Jury*, it is no longer good law.[3] The remaining cases on which movant relies involve either non-legal business communications, *In re Kaplan*, 110 F.R.D. 161 (S.D.N.Y.1986), or drafts of tax returns or financial information used in tax return preparation, *Colton*, 306 F.2d 637; *United States v. Schenectady Savings Bank*, 525 F.Supp. 647 (N.D.N.Y.1981), a fact pattern too remote to provide a helpful principle of decision here.

If the confidentiality of a client's communication to an attorney about possible litigation were to be destroyed by the intention that the attorney use the information conveyed in order to assert his client's rights, the privilege would have no meaning. To say that the communication is not privileged unless the attorney's lips are thereafter sealed concerning the facts of the case serves no societal purpose, and in

---

3. *Gilhuly* is probably distinguishable from both *Grand Jury* and the instant case in that the documents at issue there—draft lists of asbestos products to which plaintiff in a product liability case claimed to have been exposed—were obviously prepared for the *sole* purpose of production to the adversary. Here, the July 10 memorandum clearly had a broader purpose than assisting Gilmore in composing a pre-suit letter.

fact would seriously impede settlement of disputes prior to commencement of litigation. *Sylgab Steel & Wire Corp. v. Imoco–Gateway Corp.*, 62 F.R.D. 454, 458 (N.D.Ill.1974), *aff'd mem.*, 534 F.2d 330 (7th Cir.1976).

*Waiver*

Movant next argues that if the July 10 memorandum was ever privileged, the privilege was waived by disclosure of what he characterizes as its "contents," first in the Gilmore letter, and later in the Complaint. Neither the Gilmore letter nor the pleading disclosed the existence, much less the "contents," of the July 10 memorandum; all that was "disclosed" in both instances was the underlying *facts*, to which the privilege never attached. *See In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1037; *see also Upjohn Co. v. United States*, 449 U.S. at 395–96, 101 S.Ct. at 685–86; *Dowd v. Calabrese*, 101 F.R.D. 427, 439 (D.D.C. 1984). The cases relied on by movant for the proposition that disclosure of the facts waived the privilege as to the communication do not so hold; all involved either disclosure of the actual communication, *In re Horowitz*, 482 F.2d at 81–82; *In re Grand Jury Subpoenas Dated Dec. 18, 1981 and January 4, 1982*, 561 F.Supp. 1247, 1260 (E.D.N.Y.1982); *United States v. Aronoff*, 466 F.Supp. 855, 860–62 (S.D.N.Y.1979), or information communicated to the attorney in circumstances such that the privilege never attached, *United States v. Lawless*, 709 F.2d 485, 488 (7th Cir.1983); *United States v. Tellier*, 255 F.2d at 448; *Gilhuly v. Johns–Manville Corp.*, 100 F.R.D. at 753.

■ On the record on this motion, the only persons to whom the privileged communication was shown to have been disclosed were plaintiff's wife and another of his attorneys, Mr. Ellis.[4] Neither of those disclosures can be deemed a waiver, since both were consistent with the maintenance of the confidential attorney-client relation-

ship. *See McCormick on Evidence* Sec. 91 (E. Cleary 3d ed. 1984) and cases cited; *see also* Supreme Court Standard 511 to Fed.R. Evid. (waiver not applicable "if the disclosure is itself a privileged communication"), which although not enacted by Congress "continues to have utility as a Standard," 2 J. Weinstein & M. Berger, *Weinstein's Evidence* 511–1 (1986). Likewise, plaintiff's disclosure of the facts that were the subject of the memo did not waive his right to object to disclosure of the confidential *communication* itself. *United States v. Aronoff*, 466 F.Supp. at 860.

Finally, movant argues that nondisclosure of the July 10 memorandum "prejudices" his position because of its relevance to the issue of what representations were made by Piel to Solomon on January 28, 1986, and in particular to what movant characterizes as "inconsisten[cy]" between the Gilmore letter and plaintiff's complaint on that point. The claimed inconsistency is purely speculative. Gilmore's statement that "*the magazine* was to be sold for approximately $250 a share" makes clear that he thought *Scientific American* and Scientific American, Inc. were the same entity. Litigation counsel, in drafting the complaint, correctly distinguished between the magazine and the parent company; they did not thereby impeach the credibility of their client.

The concept of balancing the harm resulting from disclosure against the adversary's need to prepare his case, although codified in Fed.R.Civ.P. 26(b)(3) as an element of work product privilege, has not been applied by the Second Circuit to the attorney-client privilege except in the limited circumstance of an implied waiver by partial disclosure, as where a party places the privileged communication in issue, such as by asserting the advice of counsel as a defense. *See generally In re Von Bulow*, 828 F.2d 94, 101–02 (2d Cir.1987) (collecting cases). That is not the case here.[5]

---

4. Movant also refers to plaintiff's inability, on deposition, to deny categorically that anyone else had seen the memo. His papers cite no case predicating a waiver on such a fact pattern, and our research has discovered none.

5. Even with respect to work product, a party's mere surmise that production may disclose impeaching material is not sufficient to establish "substantial need" under Rule 26(a)(3). *See* 8 C.

Whenever a plaintiff's version of events conflicts with the defendant's account, the statements made by both parties to their respective attorneys would presumably be relevant to a determination of credibility, but if that alone were sufficient to compel disclosure, the privilege would be completely eviscerated. Thus, even if the balancing test advocated by movant were applicable here, "the *injury* that would inure to the [attorney-client] relation by the disclosure" is clearly *"greater than the benefit* thereby gained for the correct disposal of litigation." *International Telephone & Telegraph Corp. v. United Telephone Co. of Florida,* 60 F.R.D. 177, 186 (M.D.Fla. 1973) (quoting 8 J. Wigmore, *Evidence* Sec. 2285 (McNaughton rev. ed. 1961)) (emphasis in original).

*Expenses.*

■ Plaintiff has included in his opposing papers a request for $3,463 in attorney's fees and expenses, in reliance on Fed. R.Civ.P. 37(a)(4). Without reaching the question whether the instant motion, brought under Fed.R.Civ.P. 37(a)(2), may be characterized as "substantially justified" as a good-faith effort to extend existing law, I find that, on this record, "other circumstances make an award of expenses unjust" within the meaning of Rule 37(a)(4). In view of plaintiff's failure to bring to the Court's attention controlling Second Circuit precedent, as well as the extent to which his opposing papers rely on conclusory affidavits, this is a case in which the respective parties should bear their own costs.

### CONCLUSION

The motion of defendant Gerard Piel to compel production of plaintiff's July 10, 1986, memorandum to his attorney is denied. Plaintiff's application for an award of attorney's fees and expenses in opposing the motion is also denied.

It is so ordered.

Wright & A. Miller, *Federal Practice and Proce-*

*dure* Sec. 2025 (1970 & Supp. 1987).