Paul John **CARBO**, Frank Palermo, Joseph Sica, Louis Tom Dragna, and Truman K. Gibson, Jr., Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 17762.

United States Court of Appeals Ninth Circuit.

Feb. 13, 1963.

Rehearing Denied March 19, 1963.

See also 302 F.2d 456.

William B. Beirne and A. L. Wirin, Los Angeles, Cal., for appellant Carbo.

Jacob Kossman, Philadelphia, Pa. and Morris Lavine, Los Angeles, Cal., for appellant Palermo.

Russell E. Parsons, Edward I. Gritz, Iener W. Nielsen, Fresno, Cal., of counsel, for appellant Sica.

Fred Okrand, Los Angeles, Cal., for appellant Dragna.

Loren Miller, Los Angeles, Cal., William R. Ming, Jr., Chicago, Ill., for appellant Gibson.

Francis C. Whelan, U. S. Atty., Robert E. Hinerfeld, Asst. U. S. Atty., Alvin H. Goldstein, Jr., Special Asst. to the Atty. Gen., Los Angeles, Cal., for appellee.

Before BARNES, HAMLIN and MERRILL, Circuit Judges.

MERRILL, Circuit Judge.

Appellants stand convicted of extortion affecting commerce and conspiracy to extort in violation of 18 U.S.C. § 1951, commonly known as the Hobbs Act,[1] of the interstate transmission of threats and conspiracy to transmit in violation of 18 U.S.C. § 875(b),[2] and of conspiracy to commit an offense against the United States under 18 U.S.C. § 371.[3] They were variously charged in ten counts of an indictment by the Grand Jury of the Southern District of California, Central Division. On May 30, 1961, following trial, they were found guilty by jury verdict and on December 2, 1961, were duly sentenced. They have appealed from their several judgments of conviction.

The case involves in general the business of professional boxing and fight promotion and, more specifically, the efforts of appellants to secure managerial control of Don Jordan, a welterweight fighter, by bringing pressure to bear on his manager, Donald Nesseth. These efforts were prompted, according to the theory of the United States as expressed in its brief, by the fact that " * * * 'control' of champions and top contenders was the only significant profit factor in the operation of the boxing business. The evidence shows that 'control' was effected and maintained through matching controlled fighters with one another and that the technique for obtaining this control

---

1. "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

 \* \* \* \* \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

2. "(b) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

3. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

was to capture the fight manager through use of economic and, as a last resort, physical coercion."

Since the contentions on appeal relate importantly to the sufficiency of the evidence, the facts must be dealt with at some length.

## THE FACTUAL BACKGROUND

The matching of controlled fighters has already been considered by the federal courts in proceedings brought against the International Boxing Clubs of New York and Illinois for violation of the Sherman Act. International Boxing Clubs of N. Y. v. United States, 1959, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270, affirming United States v. International Boxing Clubs of N. Y., S.D.N.Y., 1957, 150 F.Supp. 397. Since these proceedings figure directly in the background of the case at bar, a reference to the facts there established is helpful. The Supreme Court, 358 U.S. at pages 245–246, 79 S.Ct. at pages 247–248, 3 L.Ed.2d 270 recites:

"The conspiracy began in January 1949, when appellants Norris and Wirtz, who owned and controlled the Chicago Stadium, the Detroit Olympia Arena and the St. Louis Arena, made an agreement with Joe Louis, the then heavyweight boxing champion of the world. Wishing to retire, Louis agreed to give up his title after obtaining from each of the four leading contenders exclusive promotion rights including rights to radio, television and movie revenues. Upon securing these exclusive contracts Louis assigned them to the appellant International Boxing Club, Illinois * * *."

The opinion then recites that Norris and Wirtz organized the International Boxing Club of New York and for it acquired control of Madison Square Garden and entered into other contracts. The opinion then states, 358 U.S. at pages 247–248, 79 S.Ct. at pages 248–249, 3 L.Ed.2d 270:

"This series of agreements, consummated within four months' time, gave appellants exclusive control of the promotion of boxing matches in three championship divisions, i. e., heavyweight, middleweight, and welterweight. Not satisfied with this temporary control, however, appellants perpetuated their hold on championship bouts by requiring each contender for the title to grant to them an exclusive promotion contract to his championship fights, including film and broadcasting, for a period of from three to five years. Over the facilities for the staging of contests appellants exercised like control, owning or managing the 'key' arenas and stadia in the Nation.

\* \* \* \* \* \*

"The effect of the conspiracy is obvious. Using the facilities of I. B.C., Illinois, and I.B.C., New York, appellants entered into exclusive promotion contracts with title aspirants, requiring exclusive handling agreements in the event the contender became champion. In amassing their empire, appellants obtained control of champions in three divisions. The choice given a contender thereafter was clear, i. e., to sign with appellants or not to fight."

Later, 358 U.S. at page 254, 79 S.Ct. at page 252, 3 L.Ed.2d 270, the opinion states:

"This illegal activity gave appellants an odorous monopoly background which was known and still feared in the boxing world."

By the decree Norris and Wirtz were directed to divest themselves of their stock holdings in Madison Square Garden. The boxing clubs were ordered dissolved. All exclusive agreements for the promotion of boxing events were banned.

Appellant Truman Gibson, a Chicago attorney, represented Joe Louis in 1949 at the outset of the sequence of events described in the Supreme Court opinion and from their inception was active in the affairs of the International Boxing Clubs. In 1958 he was made president

of both clubs. It is the government's position that as antitrust pressure was applied to the clubs they ceased their practice of requiring that exclusive management be granted to the clubs; that the practice of securing exclusive management agreements was continued by Appellants Carbo and Palermo and that Appellant Gibson, with full knowledge of Carbo's practices and methods of operation, continued, through his dealings with Carbo and for their mutual advantage to match Carbo-controlled fighters.

Carbo, with a background of underworld association, emerges as the leader of the conspirators. Gibson's first contact with him came shortly after the boxing clubs were organized sometime in 1950. From time to time between 1954 and 1957, Gibson caused payments amounting to approximately $40,000.00 to be made to Carbo by the boxing clubs through the device of placing Carbo's wife, Viola Masters, on the clubs' payrolls for fictitious employment. Payment was explained by Gibson as being for the purpose of securing Carbo's good will and of preventing fighters or managers with whom Carbo had "influence" from becoming antagonized or alienated. In investigations conducted by the United States Senate, Gibson had explained why Carbo's wife had been employed rather than Carbo himself: "Because it looked a little bit better on our records, not ever considering the possibility of being called before a senate investigative committee, to have Viola Masters down instead of Frank Carbo." Both before the Senate committee and in trial below, Gibson acknowledged that in their operations the boxing clubs had had dealings with the underworld. This practice was resorted to in order "to maintain a free flow of fighters without interference, without strikes, without sudden illnesses, without sudden postponements." Gibson testified that the boxing clubs would use "everyone" they could to prevent fixed fights and that in "everyone" he included the underworld. On redirect examination Gibson was asked whether it was "the policy of the International Boxing Club or any other organization with which you were connected in the fight business to use force or violence or threats of force and violence * * *" to which Gibson replied "No indeed." On re-cross-examination he was asked: "Of course, Mr. Gibson, when you used various people to achieve your ends you didn't know what those other people were doing on your behalf, did you?" To which Gibson answered: "Not completely, no."

The district court judgment in the antitrust action was rendered in March, 1957. Commencing in the summer of 1958 Gibson sought to extend the influence of the boxing clubs to the west coast. At that time there were two exhibition halls in Los Angeles suitable for the staging of boxing contests: the Hollywood Legion Stadium and the Olympic Auditorium. Gibson moved to secure control of both.

At this time he was in charge of promoting weekly the two nationally televised boxing contests: Wednesday night on ABC and Friday night on NBC. At least $180,000.00 a week was received by the boxing clubs in connection with these promotions. The possibility of sharing in the television profits provided an incentive to deal with Gibson. A new organization known as the "Hollywood Boxing and Wrestling Club" was established by Gibson and his associates to lease the Hollywood Legion Stadium. The International Boxing Clubs lent $28,000.00 to this organization to commence operation. Named as president of the new organization and acting as its promoter and matchmaker was Leonard Blakely, known professionally (and hereinafter referred to) as "Jackie Leonard." Leonard's vulnerability to economic pressure from Gibson is apparent. Not only was his club indebted to Gibson's organizations but his future was largely dependent on Gibson's good will with respect to participation in the televising of contests.

In the fall of 1951, Virgil Akins, a Carbo-controlled fighter, was welterweight champion. A promising contend-

er was Don Jordan, who was managed by Donald Nesseth. Nesseth had been making repeated efforts to obtain fights for Jordan on national television and had enlisted Leonard's support in this respect. With Gibson's assistance Leonard secured one such fight at the Legion Stadium with the fighter then ranked as the number one contender in the welterweight ranks. Jordan won this and two other televised bouts and became the leading contender for the title. A fourth match at the Olympic Auditorium in Los Angeles was arranged for October 22, 1958, and Gibson assured Nesseth that Akins, the champion, had agreed to defend his title against the winner of the bout. Jordan won.

The sequence of events which are now related are based in large part on the testimony of Jackie Leonard and in many respects are vigorously denied.

On October 23, 1958, while Nesseth, Leonard and Gibson, at the Olympic Auditorium, were discussing the anticipated championship fight between Akins and Jordan, Gibson received a telephone call from Appellant Palermo. Gibson spoke briefly and then handed the phone to Leonard, saying that "Blinky" wanted to speak to him. Palermo told Leonard, "We are in for half the fighter [fifty per cent of the manager's share] or there won't be any fight." Leonard protested that he had never heard of any such proposition before, and Palermo, upon learning that Gibson had not explained the situation, told him to talk it over with Gibson and call him back. When Leonard recounted the conversation, Nesseth flatly refused. Gibson explained that Carbo and Palermo controlled Akins and apologized for not having informed him of Palermo's demands earlier.

Gibson, Nesseth and Leonard met later in the day at Gibson's hotel for purposes of privacy and continued to discuss Palermo's demands. According to Leonard's testimony, Gibson said: "You know how Carbo and Blinky [Palermo] are * *. They want all of everything before you can get a welterweight title fight * *

[but] go along with it. It has been done before. That is the way the welterweight and lightweight title has been worked since Carbo and Blinky got into the picture." Gibson proposed that Nesseth should tell Palermo that he agreed, and assured Nesseth and Leonard that he, Gibson, would straighten things out later in Chicago. Nesseth refused. He feared violent retaliation if Carbo and Palermo, falsely informed that Nesseth had yielded, should later discover that he had no intention of surrendering an interest in Jordan. He testified: " * * we reminded Truman [Gibson] that these weren't kids that we were talking to, and that he couldn't do very much protecting from 2,500 miles away, if they decided to start playing rough, and Truman scoffed at that and said that went out with high-buttoned shoes, that there wouldn't be any of that, and not to worry, that he would straighten it out." Gibson finally persuaded Leonard to call Palermo and to tell him the arrangement was satisfactory. This Leonard did, learning from Palermo that Gibson had already advised him that everything was all right.

On December 5, Jordan defeated Akins and became the welterweight champion of the world. The fight arrangements called for a re-match if Jordan won, with Palermo's share of both fights being payable after the re-match. Jordan won the re-match.

Between these two matches, Jordan on January 22, 1959, fought a match with another fighter, Gutierrez. Leonard asked Gibson who was to pay Palermo's share of that fight and Gibson said that if necessary he would pay it himself.

After the Gutierrez fight, when the money was slow in coming, Palermo telephoned Leonard, screamed and shouted that he was being stalled and double-crossed. Leonard tried to pacify him by telling him that he had seen Gibson that day and that the money would be sent. Palermo said he didn't want to hear anything about Gibson; that he was holding Leonard and Nesseth responsible and that Leonard was expected to handle

Nesseth. Carbo then took the phone from Palermo and, according to Leonard's testimony, "He said, 'You son-of-a-bitching double-crosser.' He said, 'You are no good,' and he says, 'Your word is no good. Nothing is no good about you.' He said, 'Just because you are 2,000 miles away, that is no sign I can't have you taken care of.' He said, 'I have got plenty of friends out there to take care of punks like you.' He said, 'The money had better be in.' * * * I was trying to get a word in edgewise, to tell him the money would be sent that day. He wouldn't let me say anything, he was just cursing and hollering at me and saying there would be somebody out here to take care of me, and if that money wasn't there right away somebody would be looking me up."

Leonard was badly frightened by the conversation. After hanging up he turned to Nesseth, who had been standing next to the telephone booth, and told him everything that had been said. Nesseth noticed that Leonard was "shaken up, nervous."

Leonard later, by arrangement with Gibson, sent his personal check for $1,725.00 to Claire Cori (Palermo's wife) and was reimbursed by Gibson.

During this period of time Palermo and Gibson both began to express an interest in matching Jordan with Sugar Hart, another Carbo-controlled welterweight. Nesseth was not interested. The match would be a hard one and Nesseth felt easier matches would be more profitable and less risky.

The Jordan-Akins re-match was held in St. Louis on April 24, 1959. Palermo immediately demanded his share from Nesseth. Nesseth flatly refused to pay anything and explained that he had never consented to surrender an interest in Jordan and the circumstances under which Leonard and Gibson had stated the contrary to Palermo. Palermo's final comment was that " 'The Man' isn't going to like this." Palermo called Leonard and, according to Leonard's testimony: "He told me I would be hearing from him right away, I better do something to straighten this mess out or I was going to get into a lot of trouble with the people back East."

On April 28 Nesseth and Leonard were in Leonard's office when a call came from Carbo. Leonard testified: " * * * the voice said, 'Hello, hello, hello. You know who this is?' I says, 'Yeah, I know who this is.' And he says, 'You're a no good'—and he used some vulgar language and called me a double-crosser and told me that he was going to get somebody to take care of me, that if he was there, he would gouge my eyes out, and I was going to get hurt, and when he meant hurt, he meant dead, and he called me another S.B. and different names, real bad names, 'double-crosser,' and he says, 'We are going to meet at the crossroads,' he says, 'You will never get away with it. I have had that title 25 years and no punks like you are going to take it away from me,' and he repeated that statement, he says, 'When I mean get you, you are going to be dead,' he said, 'We will have somebody out there to take care of you.' "

Nesseth testified: "What I heard from Leonard's end of the conversation, there wasn't very much conversation on his part. One or two times he stammered and said, 'You shouldn't say those things.' But the call, I would say it was very one-sided, and I did notice and observe that Leonard turned about the color of your shirt during the course of that conversation, and when the phone call was over and he hung up the phone he sat there just for a second and he got up and ran across the hall to the ladies' room, which we used during the daytime as a men's room, and he vomited. I have never seen anybody any more shaken up than he was at that time."

A few minutes later a telephone call came from Palermo. Leonard testified: "And he said, I was a double-crosser and I was no good and he was coming to the coast and he was going to see some people and they were going to see me. And I told him there was no good to come, and I was mad, I was very mad, and I hung up on Blinky."

Later, at Leonard's home, he received another call from Palermo which he described as follows: "He wanted to know if I cooled off yet and said, 'Jesus, there is no use being like that.' He says, 'After all, maybe the guy shouldn't have called like that, but' he said he figures he had a right to, 'they have had that account a long time and you people out there are double-crossing him.' He said, 'Now, we might as well be like gentlemen and not be mad,' and he says, 'I will be out there and talk to you.' I said, 'There is no use of coming out here, I am fed up with all of you,' and I told him he would have to see Nesseth and he said, 'I can't see Nesseth unless he will sit down and talk to me.' And I said, 'You will have to take care of that, there is nothing I can do about it. Nesseth doesn't want to talk to any of you and if you want to talk with him, you will have to make your own contact with him.' With that he said, 'Well, I will be out there in a few days and we are going to look you up.' "

On April 30 Gibson, who had been notified by Leonard of the threatening calls, telephoned Leonard and offered to pump additional capital into the Hollywood Club if Leonard would persuade Nesseth to agree to a Hart fight. On the same day Palermo arrived in Chicago from the east and stayed at the Bismark Hotel (owned by Norris and Wirtz) at the expense of the Boxing Clubs. On May 1 he met with Gibson and Hart's manager in the lobby of the hotel and thereafter left for Los Angeles.

On May 2 Leonard had a telephone call from Palermo summoning him to a late night meeting at a Los Angeles hotel. He entered the hotel to find Palermo in company with Appellant Sica. Describing his reaction to Sica's presence in company with Palermo, Leonard testified: "Well, the minute I seen him I remembered what Carbo had told me before about somebody on the west coast taking care of me and for once I was scared, when I seen him. * * * Well, by reputation I had always known of Joe Sica as an underworld man and a strong-arm man."

In their conversation, according to Leonard, Sica stated: "He says, 'Look, Jackie, you made a choice. It is a question of either you or Don Nesseth is going to get hurt. Wouldn't you rather go grab him by the neck and straighten him out, than for me to go back tell "The Gray"? You try it, you are all right, but it is Nesseth that is no good.' 'The way it is now,' he says, 'you and Blinky have both got your necks in a sling,' and he said, 'Something has got to be straightened out.' He said, 'If you have to, go out and beat the hell out of Nesseth. If you need any help we will go with you and help you and drag him out of bed.' "

Also, referring to Palermo, Leonard stated: "Well, Blinky said, 'That is the only answer to the whole problem,' was for me to convince Nesseth to fight Sugar Hart and that that would straighten things out, as far as Carbo was concerned. And Sica agreed there, too. He said that I had my head in a noose and that was the only way I was going to get the thing straightened out, was to grab hold of Nesseth and make him take the fight with Sugar Hart."

The following day Nesseth called Gibson to complain of the threats that had been received. Gibson disclaimed responsibility but, according to Nesseth, "Truman said, 'Well, all the pressure can be relieved and you can also do your own Jackie Leonard a favor by saving his Club, if you will just agree to fight Sugar Hart.' And I told him they could forget that, because I had better things in mind and I wasn't going to fight Sugar Hart. We must have talked for probably 15 minutes and Truman agreed that he would call Norris and see what he could do about getting these people out of town."

On May 4, while Nesseth and Leonard were in Leonard's office, Palermo appeared and, shortly thereafter, Appellant Dragna. Nesseth immediately left the room. Palermo, in Leonard's presence, then explained the problem to Dragna.

and asked what Dragna thought of it. According to Leonard: "Dragna says, 'Well, you are wrong, Jackie. You are dealing with big people and your word should be your bond.' He says, 'After all, if your word is no good, then you are no good in this game. Everything is dealt—you are dealing with real nice people and big people, and if your word is no good you are no good in this game.' "

Dragna inquired about Nesseth; whether he did not live out his way in West Covina and again whether he did not have a wife and child. Later, according to Leonard, Palermo stated: "' 'Well, we have to make this Hart fight. At least, if I can go back and tell "The Old Man" '—meaning Frank Carbo— 'tell him I have the Hart fight, that will take a lot of pressure off. I can tell him you tried and I tried and at least we have something accomplished.' He said, 'I am going to leave,' and he said, 'I want you to make sure things are taken care of.' Dragna told me, he says, 'You are right in the middle of this thing, Jack.' And he said, 'You better try to get it straightened out or,' he says, 'you can be in a lot of trouble.' "

As with Sica, Leonard understood that Dragna was connected with the underworld and associated his appearance with Carbo's threat. Nesseth also testified that he understood both Sica and Dragna were connected with the underworld. Dragna's appearance so upset him that he immediately sought and obtained police protection.

On May 5 an induction coil connected with a tape recording machine was placed beside Leonard's home telephone, with his consent, by the Los Angeles Police, and his office was equipped with a concealed microphone.

The following day Sica and Palermo called on Leonard and Nesseth at Leonard's office in an effort to persuade Nesseth to agree to a fight with Sugar Hart. The visitors received no satisfaction. As Sica was leaving, he leaned over Leonard and, according to Leonard, whispered in his ear: "Jackie, you are it." Nesseth confirmed that Sica had whispered in Leonard's ear as he was leaving.

On May 7, in telephone conversation with Gibson, Leonard had reported that Nesseth was still refusing a fight with Hart. Gibson stated, "Well, it's too bad. I could have saved the club if I could have made that fight."

On May 11, Gibson flew to Los Angeles with William Daly, named as an unindicted co-conspirator. Leonard was out of town and was telephoned by Gibson, who advised that he had to return to Chicago but was leaving Daly there to talk to Leonard.

On May 13, after Leonard had returned, Daly called on him at his office. He wanted to know what Leonard was going to do about the money owed to Gibson. He said Leonard was in "hell of a jam" both regarding his club's financial obligations and regarding Nesseth. He said: "Carbo is really boiling." He told Leonard to call and see him at his hotel the next day.

The following day Leonard was equipped by the police with a Minifon wire recording device and also with a portable transmitting device. He then called on Daly. A lengthy conversation ensued, all of it taped.

According to Daly, Gibson was upset, saying he was in "a jackpot" because he had allowed the title to get out of "their" hands. He had accused Leonard and Nesseth of trying to destroy him, and had stated that instead "I'll have them destroyed." There was a discussion of a near fatal assault on Ray Arcel, a Carbo-controlled manager who had asserted his independence. Daly explained the technique of assault:

"See what they do. They use a water pipe, see, You know, regular lead water pipe. Lead pipe. And about that short. About that thick. And they just get an ordinary piece of newspaper, see, newspaper don't show fingerprints. Then they take it and they wrap it just in the newspaper, see— * * * Just an ordinary piece of paper, that's all they ever use. And you sitting in a

crowd. And they try to give you two bats, and they kill you with two if they can. But they whack you twice and split your—fracture your skull, and knock you unconscious, and they just drop it, they can't—there's no heat. You can't—you haven't got no weapon on you. If they said you did it, what the hell, you drop it in a crowd or out in the street. They drop it immediately. After they do it they drop it. And after they drop it—the law—they're protected by the law. They have to have witnesses. They seen them come out and that's the guy, and that's what he used." And later: "They used a couple kids from Boston to do it." Leonard: "They always use professionals, guys from out of town." Daly: "Yeah, they were kids." Leonard: "Like here, if they wanted Don and I, they're not going to use somebody that we know around here." Daly: "No. The Sicas would be home."

Leonard inquired as to why Sica was becoming involved in something not his business. Daly replied: "Well then, people in New York do them favors," and later: "I don't know what way they're going to handle that Nesseth, but they are going to handle him some * * * way." Daly complained of having to stay in Los Angeles. "I got a lot of things home to try to straighten out. But Truman says, 'Wait 'til Monday.' He's coming in Monday. What'll happen Monday, Jack?"

Leonard explained how he hoped to get financial aid for his club from a San Francisco promoter, Don Chargin, and stated that now Sica wanted to see Chargin. Daly stated: "Oh, they'll get somebody up around San Francisco to go see him, and tell him to lay off you people. * * * You know. So it'll make the guy think a little bit, too, you know."

On June 4 Chargin was planning a trip from San Francisco to Los Angeles in connection with his negotiations with Leonard to take over the failing Hollywood Boxing and Wrestling Club. He received an anonymous telephone call as to which he testified: "The call stated to stay out of Hollywood and that they knew my flight number and also that 'you saw what happened to Jack Leonard' * * * ." Leonard had received a beating and had been hospitalized.

In September, 1959, Leonard's club failed and went into bankruptcy. Since Leonard could no longer obtain nationally known fighters, he quit the boxing business.

Also in September the indictment against these appellants was returned.

The indictment contained ten counts. Two of the counts charged all of the appellants (together with unindicted co-conspirator William Daly) with conspiracy: Count 1 with a conspiracy to commit extortion;[4] Count 5 with a con-

4. Paragraph 3 of this count reads as follows:
"The objects of such conspiracy were to be accomplished as follows:
"a. The defendants Paul John Carbo and Frank Palermo, by use of threats of physical harm and violence and threats of economic loss and injury to the victims Donald Paul Nesseth and Leonard Blakely, aka Jackie Leonard, were to obtain monies representing a share of the purses earned by a professional prize fighter then engaged in championship matches being nationally televised, to wit, Donald Jordan, and to obtain control of the professional activities of the same Don Jordan by naming the opponents whom he would fight and also the places where and conditions under which he would engage in such boxing matches.
"b. The defendants Paul John Carbo and Frank Palermo intended to obtain said monies and control by and with the consent of the victims Donald Paul Nesseth and Leonard Blakely without paying any consideration for the monies and control so received.
"c. It was a further part of said conspiracy that defendants would enlist the services of persons known to the said victims to have underworld reputations and to possess the necessary power to execute the conspirators' demands by force and violence; and, for that purpose did enlist Joseph Sica and Louis Tom Dragna who were to personally contact

spiracy to transmit threats by means of interstate communications.[5]

In eight counts Appellants Carbo, Palermo and Sica were charged with substantive offenses. Carbo and Palermo were charged in Counts 3 and 2, respectively, with obtaining the sum of $1,725.00 from Leonard through threats of physical injury and violence. Palermo and Sica, in Count 4, were charged with attempts to coerce Nesseth through fear and threats of violence into giving up part of his contractual control of Jordan by signing a match with Sugar Hart. Carbo and Palermo, in Counts 6, 7, 8, 9 and 10, were charged with the interstate transmission of threats to injure Leonard and Nesseth.

By jury verdict all defendants were found guilty as charged. The following sentences were imposed:

Carbo: Imprisonment consecutively for twenty years on Count 1 and five years on Count 3, a total of twenty-five years, plus a fine of $10,000.00.[6]

Palermo: Imprisonment for fifteen years on Count 1, plus a fine of $10,000.00 [7]

Sica: Imprisonment for twenty years on Count 1, plus a fine of $10,000.00.[8]

Dragna: Imprisonment on Counts 1 and 5 for five years each to run concurrently.

Gibson: Imprisonment on Counts 1 and 5 for five years each to run concurrently, plus a fine of $10,000.00. Imprisonment was then suspended and Gibson was placed on probation for a period of five years.

## SUFFICIENCY OF THE INDICTMENTS

Appellants make several attacks on the indictments.

First, it is contended that Counts 1 through 4 failed to allege offenses cognizable in the federal courts because there is no sufficient showing that the extortion charged affected commerce. It

Leonard Blakely and Donald Paul Nesseth and obtain their agreement to the conspirators' said demands.

"d. It was an essential part of the conspiracy that defendant Truman Gibson, Jr., who was an officer of the International Boxing Club, Inc., and the National Boxing Enterprises, Inc., a major promoter of nationally televised prize fights, and an influential figure in other business associations, would use his power and authority to persuade victims Donald Paul Nesseth and Leonard Blakely to accede to the demands of the conspirators for control of the prize fighter Don Jordan."

5. Paragraph 3 of this count reads as follows:

"The objects of said conspiracy were to be accomplished as follows:

"a. The defendants Paul John Carbo and Frank Palermo were to transmit interstate telephone communications containing threats of physical harm and violence and threats of economic loss and injury to victims Donald Paul Nesseth and Leonard Blakely, aka Jackie Leonard, in an effort to obtain monies representing a share of the purses earned by a professional prize fighter then engaged in championship matches being nationally televised, to wit, Donald Jordan, and

control of the professional activities of the same Don Jordan by naming the opponents whom he would fight and also the places where and conditions under which he would engage in such boxing matches.

"b. The defendants Paul John Carbo and Frank Palermo intended to obtain said monies and control by and with the consent of victims Donald Paul Nesseth and Leonard Blakely without payment of considerations for the monies and control so received."

Subparagraphs c. and d. are substantially the same as those set forth in footnote 4 as to Count 1.

6. On Counts 5, 7 and 9, imprisonment consecutively for five years, a total of fifteen years, was made to run concurrently with the twenty-five years imposed for Counts 1 and 3.

7. On Counts 2, 4 and 5, imprisonment consecutively for five years, a total of fifteen years, was made to run concurrently with the fifteen years imposed for Count 1. Likewise, imprisonment consecutively for five years each on Counts 6, 8 and 10, a total of fifteen years, was made to run concurrently.

8. A sentence of five years on Counts 4 and 5 was made to run concurrently.

is asserted that neither a contract between one fighter and his manager nor a share of the fighter's purse constitutes commerce.

■ Under the Hobbs Act (as distinguished from the Sherman Act) it is not necessary that the subject of the extortion constitute commerce. All that is required is that trade or commerce be affected by extortion "in any way or degree." The quantum of effect under the Hobbs Act is thus entirely different from that required under the Sherman Act.[9]

This is clearly pointed out in United States v. Malinsky, S.D.N.Y., 1956, 19 F.R.D. 426, 428, denying a motion to dismiss an indictment for failure to allege with sufficient particularity the manner in which the claimed extortion affected commerce. There it was stated:

"Whereas under that Act it may be that a court must find that the acts complained of have a direct and substantial effect on interstate commerce, under the subject statute there is no need for such a finding. The statute provides that effect in 'any way or degree' is sufficient. Congress itself has concluded that any effect upon interstate commerce in any degree caused by extortion or conspiracy contemplating extortion is in itself substantial. The substantiality of the effect is not left to judicial determination. * * * Congress quite understandably might prohibit extortion or conspiracies based on extortion which affect interstate commerce in any degree. Their corrosive quality is not likely to be subject to quantitative measurement to the same extent as the economic effect of combinations in restraint of trade."

In United States v. International Boxing Club of N. Y., Inc., 1954, 348 U. S. 236, 75 S.Ct. 259, 99 L.Ed. 290, it was held that the business of promotion of professional championship boxing contests and the selling of rights to televise, broadcast and film such contests for interstate transmission constituted commerce within the Sherman Act.

Here it can hardly be denied that such commerce is affected in some degree by extortion to obtain control of a champion fighter. A sufficient effect on commerce under the Hobbs Act has then been charged.

■ Further attacking the sufficiency of Counts 1 through 4 to charge a federal offense, appellants contend that the Hobbs Act is vague and uncertain in its application to the boxing business and may not constitutionally be applied to the charged acts of extortion.

Undeniably the act was particularly aimed at labor racketeering, but by its terms it is not so limited.[10] Racketeering in other areas is clearly included. The language of the statute provides fair warning and adequate notice that extortion in any area is included so long as the necessary effect upon commerce results.

■ It is contended that Counts 1 and 5 fail to meet the requirement of Rule 7(c), F.R.Cr.P., that they provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." It is asserted that they do not allege how interstate commerce was to be delayed, obstructed or affected by the charged conspiracy; or how the threats charged could yield control of Jordan or a share of his purse; or what agency of interstate commerce was to be used to convey the alleged threats; or between what points these threats were to be communicated.

9. See Hulahan v. United States, 8 Cir., 1954, 214 F.2d 441, 445, cert. den., 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954).

10. The legislative history of the bill indicates that while most of the drafting problems presented by the bill related to its coverage of labor activities, the bill was broadly conceived of as part of a legislative plan to deter professional gangsterism. S.Rep. No. 1440, 73d Congress, 2d Session.

It is not necessary to plead such evidentiary detail.[11] Subparagraph 3 of each count clearly alleged the scheme for accomplishing the criminal goals of the conspiracy, including reference to the role each of the five defendants was to play in the attainment of these goals. This is sufficient.[12]

■ It is also contended that the substantive counts relating to the threatening communications did not charge offenses since they failed to contain any allegation determining venue.

■ Rule 7(c) does not require venue to be pleaded. Since it is waivable,[13] it is not an essential fact constituting the offense charged.[14] Defendants have the right to be tried in the proper forum, not the right to be charged with the proper venue.[15]

In this case a bill of particulars giving full details respecting venue was filed one month after the indictment was returned. There was then no possibility of prejudicial surprise.[16]

■ The contention that § 1951 is not within the power of Congress and contravenes the Tenth Amendment was refuted in Nick v. United States, 8 Cir., 1941, 122 F.2d 660, cert. den., 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, reh. den., 314 U.S. 715, 62 S.Ct. 411, 86 L. Ed. 570, reh. den., 316 U.S. 710, 62 S. Ct. 1103, 86 L.Ed. 1776 (1942). The conspiracy and substantive offenses under § 1951 do not merge.[17] Nor is the § 371 conspiracy identical with the § 1951 conspiracy.

We conclude that in all respects of which the appellants complain, the indictments sufficiently charge the federal offenses to which they were directed.

## SUFFICIENCY OF THE EVIDENCE

All defendants assert a lack of substantial evidence of guilt upon all counts in which they were charged. Our discussion of this contention is, of course, subject to our later discussion of other assignments of error in which attack is made upon specific portions of the record.

■ Accepting the facts and the testimony as we have recited them, the contentions of Carbo, Palermo and Sica may be summarily dismissed as to the substantive counts. Their contentions are founded in large part upon an attack on the credibility of Leonard. We shall not disturb the jury's determination in this respect.

■ Likewise, as to the Count 1 conspiracy the evidence is amply sufficient as to these three appellants. Their active and joint participation in overt acts which themselves constituted substantive offenses leaves little doubt but that they knowingly acted in concert and pursuant to plan.

■ Likewise, as to the Count 5 conspiracy there can be no doubt but that Carbo and Palermo knowingly acted in concert and pursuant to plan.

■ As to the Count 5 conspiracy there is no evidence that Sica and Dragna entered the plot before the interstate threats had been communicated and the conspiracy fully consummated. We find no evidence that they had any knowledge of the plot at the time of the interstate threats nor anything from which an inference of conspiratorial association or agreement at that time might be inferred. The jury's verdict upon Count 5 should have been set aside as to these appellants. As to Appellant Sica the court's failure to do this is without preju-

---

11. Wong Tai v. United States, 1927, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545.

12. Schino v. United States, 9 Cir., 1954, 209 F.2d 67, 69, cert. den., 1954, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087.

13. Rodd v. United States, 9 Cir., 1948, 165 F.2d 54.

14. See Rule 12(b) (2), F.R.Cr.P.

15. Suggestions by Carbo and Gibson that they were not tried in the proper state and district are not open to consideration since no motion for change of venue under Rule 21(b) was made below.

16. Compare Bratton v. United States, 10 Cir., 1934, 73 F.2d 795.

17. Callanan v. United States, 1961, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312.

734

dice in the light of his twenty-year sentence imposed for Count 1 and the concurrent five-year sentence upon Count 4.[18]

As to Appellant Dragna, after careful consideration of the record we have concluded that there is no sufficient evidence to hold him guilty upon Count 1. The only evidence is as to the occasion on May 4, 1959, which we have recounted, when Dragna appeared with Palermo and talked to Leonard (plus evidence that Dragna and Palermo had been seen together a day or so earlier). On this occasion Dragna was simply asked what he thought and gave his opinion. Leonard, in testifying before the California Athletic Commission, described Dragna's participation as follows: "He didn't say anything, no threats. No—in fact, he was a very good gentleman there. He did very little talking. Listened."

There was nothing said which would suggest that Dragna was an interested party. There was nothing other than his presence with Palermo which could give rise to any sinister implications that he was lending his active support to a program of violence. The United States suggests that those having an underworld reputation have the burden of refraining from acting in such a fashion (or, it would seem, from being seen in association with others) when it might be construed as evincing an interested participation or a threat of violence. We cannot agree. Leonard may have been wholly justified in the conclusions he drew, but it does not follow that Dragna may be held criminally responsible for those conclusions.

As to Appellant Dragna the district court must be reversed and the sentence set aside.

As to Appellant Gibson, charged in the conspiracy counts, it must be noted that there are in fact two distinct conspiracies involved in the facts of the case. (1) The underlying conspiracy to gain control of Jordan. For business reasons of his own, Gibson was interested in furthering Carbo's ends in this respect and it is clear

that the evidence is sufficient to connect him with this underlying conspiracy. (2) The *charged* conspiracies to accomplish the underlying purpose by extortion and threatening communications.

The United States suggests that proof of the first is sufficient without more to constitute proof of the second. This is vigorously disputed by Gibson, who contends with justification that the existence of business relations with Carbo is in itself wholly consistent with innocence of the charged conspiracies.

The United States further emphasizes the fact that Gibson himself was guilty of acts of economic coercion in making it clear on at least two occasions that should Jordan sign with Sugar Hart Leonard's economic difficulties would be over, but that unless such a fight took place Gibson would be unable to save the Hollywood Boxing and Wrestling Club.

There can be little doubt that Gibson had his own business reasons entirely apart from those of Carbo and Palermo for wishing such a fight to take place. The question is whether the record can support a determination that for these independent business reasons Gibson became a party to the Carbo-Palermo scheme for achieving control of Jordan through extortion and threats. In our view it does through proof of Gibson's connection with Daly.

Gibson brought Daly to Los Angeles in order to confer with Leonard and delegated Daly to act as his representative in discussions with Leonard. Gibson advised Leonard to this effect. One may logically conclude that in what Daly said, he spoke for Gibson and what he said related to Carbo and Palermo and was calculated to frighten Leonard into renewed efforts with Nesseth.

Accordingly, we conclude, subject to later discussion of specific points, that while judgment must be reversed as to Appellant Dragna the evidence is sufficient to support the jury verdict as to Appellants Carbo, Palermo and Gibson

18. See Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774.

and, as to Appellant Sica, the verdict on Counts 1 and 4.

## DECLARATIONS OF CO-CONSPIRATORS

A substantial part of the proof on the conspiracy counts consisted in what various of the co-conspirators out of court had said about their fellow conspirators. All appellants have most vigorously protested the admission of such declarations as hearsay and have contended that the district court failed adequately to instruct the jury respecting the conditions under which such declarations may be used against conspirators other than the declarant.

 It is well established that the declarations of one conspirator in furtherance of the objects of the conspiracy, made to a third party, are admissible against his co-conspirators.[19]

It is also well established, however, that such declarations are admissible, over the objection of a co-conspirator who was not present when they were made, only if there is proof independent of the declaration that he is connected with the conspiracy. Glasser v. United States, 1942, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680: "Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence."

 The following instruction was offered and was rejected: [20]

"You will recall that testimony of acts and statements made by alleged co-conspirators in the absence of a defendant was received on a tentative basis in evidence. Such testimony was received subject to independent proof of the existence of the conspiracy and the absent defendant's knowing participation in the conspiracy. If you do not find, on independent proof, that a conspiracy existed and the absent defendant knowingly participated in the conspiracy, the tentative basis is destroyed and all such testimony must be ignored as to him.

"A defendant's connection with a conspiracy must be established beyond a reasonable doubt, accordingly, by his own conduct and his own statements or declarations."

 We cannot accept appellants' view of the law as set forth in the proposed instructions. The declarations, as to defendants other than the declarant, constitute hearsay. Yet with a proper foundation they would qualify under the well recognized exception which permits the introduction of declarations of a co-conspirator.[21] The problem of co-con-

19. Logan v. United States, 1892, 144 U.S. 263, 309, 12 S.Ct. 617, 36 L.Ed. 429.

20. The district court in it charge to the jury did deal with the substance of this instruction as to Appellant Gibson. It charged:

"You are instructed that in considering the guilt or innocence of the defendant Gibson you may not consider the words or conduct of any other defendant not in the presence of Mr. Gibson unless you find that the prosecution has proved beyond a reasonable doubt that Mr. Gibson entered into a conspiracy with that defendant as charged in the indictment, and that the words of the other defendant were spoken in aid of and to further the purpose of the conspiracy."

Also, in admitting certain declarations of Appellant Palermo, the court stated:

"I will tell the jury that, of course, when any one of a group of conspirators makes a statement in furtherance of the purpose of the conspiracy, that is binding on all the conspirators. But that rule only applies if there are co-conspirators.

"Now, before you can hold any one of these defendants to be bound by this conversation with Mr. Palermo, if you believe there was such a conversation, it would be necessary for you to find from other evidence that such person, as to whom you are making applicable that conversation, was in fact a conspirator."

21. The necessary foundation consists of three distinct prerequisites. First: that the declaration is in furtherance of the conspiracy; second: that it was made during the pendency of the conspiracy; third: that there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it. See authority, infra, footnote 22; Uniform Rules of Evidence, 63(9); Model Code of Evidence, Rule

spiratorial declarations, then, is one of the admissibility of evidence under a well recognized exception to the hearsay rule. It is not a substantive question as to the qualitative sufficiency of the evidence necessary to prove the existence of a conspiracy.[22]

The situation is rendered confusing by the fact that the admissibility of this evidence (concededly relevant but challenged under a technical evidentiary rule of competence) depends upon a disputed preliminary question of fact which coincides with the ultimate jury question upon the merits.[23] The declarations are admissible against the defendants if they are co-conspirators. If they are co-conspirators they are guilty. The problem presented to us is whether the preliminary question (upon the resolution of which only independent evidence is available) is to be resolved by the jury or by the judge. Appellants' view of the law, as set forth in the proposed instructions, is that the preliminary question is to be resolved by the jury upon proof beyond a reasonable doubt.

Yet if by independent evidence the defendant's position as a co-conspirator is to be established by the jury upon their judgment beyond a reasonable doubt, there is no occasion ever to resort to the declarations at all. The district court in effect will have told the jury, "You may not consider this evidence unless you first find the defendant guilty."

The point is made in United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 230–231, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, where it is stated:

"It is difficult to see what value the declarations could have as proof of the conspiracy, if before using them the jury had to be satisfied that the declarant and the accused were engaged in the conspiracy charged; for upon that hypothesis the declarations would merely serve to confirm what the jury had already decided. In strict logic these instructions in effect altogether withdrew the declarations from the jury, and it was idle to put them in at all."

In Rowley v. Braly, 1926, Texas Civ. App., 286 S.W. 241, 245, the same thought is expressed:

"If the conspiracy is established, then what purpose can the declarations and statements introduced in evidence serve? * * * If this [rule giving the determination to the judge] is not correct, of what avail would the proof of such declarations be to the party offering them."

Finally, Maguire and Epstein, supra footnote 23, at page 407 (their footnote 47), agree that:

"If the other evidence satisfies the jury that the conspiracy has been entered into, the co-conspirator's declarations can fulfill no useful function."

We find the quoted authorities persuasive. To accept the problem as one of admissibility of evidence is to recognize that the declarations, if admissible, shall be considered by the jury *in reaching* its determination upon the issue of innocence or guilt. It will not do to tell the jury that it must reach its determination first.

The rule of law for which appellants contend would, then, effectively condemn this entire exception to the hearsay rule. This result we must reject.

---

508(b). Only the third element is controverted here, save as may hereafter be discussed.

22. See: 4 Wigmore, Evidence (3d Ed., 1940) § 1079; see generally: Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 984–989 (1959); Levie, Hearsay and Conspiracy, 52 Mich. L.Rev. 1159 (1954).

In analyzing this question, every case that has come to our attention has done so from the point of view of whether the declarations were "admissible" or "competent" evidence. Most recently in Wong Sun v. United States, 1963, 83 S.Ct. 407, the Supreme Court has recognized that "the rule which regulates the use of out-of-court statements is one of admissibility, rather than simply of weight, of the evidence."

23. See discussion, Maguire and Epstein, Preliminary Questions of Fact Determining the Admissibility of Evidence, 1927, 40 Harv.L.Rev. 392, 415.

Nor could this exception be rescued by giving the preliminary question to the jury to be decided by it upon the basis of a prima facie case rather than proof beyond a reasonable doubt. The jury is already concerned with the evidence-weighing standards involved in proof beyond a reasonable doubt. To expect them not only to compartmentalize the evidence, separating that produced by the declarations from all other, but as well to apply to the independent evidence the entirely different evidence-weighing standards required of a prima facie case, is to expect the impossible. As stated in Dennis, supra, 183 F.2d at page 231:

> "Indeed, it is a practical impossibility for laymen, and for that matter for most judges, to keep their minds in the isolated compartments that this requires."

Indeed, the injection of the standards of a prima facie case into a jury determination (even though carefully isolated, by instructions, from the ultimate determination of guilt) might very well be found to cause confusion as to standards of proof highly prejudicial to the defendant.

Therefore, we adopt in this situation the orthodox prevailing view of the allocation of functions between judge and jury, which assigns to the judge decisions upon preliminary questions of fact determinative of the admissibility of evidence challenged under technical evidentiary rules.[24]

Our position is supported by language in United States v. Dennis, supra, 183 F.2d at page 231:

> "The law is indeed not wholly clear as to who must decide whether such a declaration may be used; but we think that the better doctrine is that the judge is always to decide, as concededly he generally must, any issues of fact on which the competence of evidence depends, and that, if he decides it to be competent, he is to leave it to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent."

It is for the judge then, and not the jury, to determine the admissibility of the declarations. In making this determination the test is not whether the defendants' connection had by independent evidence been proved beyond a reasonable doubt, but whether, accepting the independent evidence as credible, the judge is satisfied that a prima facie case (one which would support a finding) has been made. Thereafter it is the jury's function to determine whether the evidence, including the declarations, is credible and convincing beyond a reasonable doubt.

The trial judge's finding on admissibility in no way restricts the jury's inquiry into guilt or innocence. As stated in United States v. Dennis, supra, 183 F.2d at page 231, quoting from United States v. Pugliesi, 2 Cir., 1945, 153 F.2d 497, 500:

> " 'The admissibility of the wife's declarations in the case at bar was for the judge, and the fact that the jury later acquitted her was irrelevant. The issue before him was altogether different from that before them: he had only to decide whether, if the jury chose to believe the witnesses, Pugliesi and his wife were engaged in a joint undertaking; they had to decide whether they believed the witnesses beyond a doubt.' No doubt, this conclusion permits the jury to act upon hearsay, because they may be satisfied of the 'joint undertaking' only because of the declaration; but it often happens that hearsay is competent, and this is the only practicable way to deal with the question."

It must be conceded that in many cases instructions such as that proposed by appellants have been held proper. We know

---

24. See Maguire and Epstein, supra.

of no case save one,[25] however, in which the failure to give such an instruction has been held error. Cases cited by appellant as holding to this effect we find distinguishable.[26]

■ Appellants assert that there was a lack of a prima facie case made out by independent evidence and that the declarations were inadmissible for this reason. We cannot agree. There was ample as to each appellant, as the district court on motion for new trial noted.

We conclude that it was not error to admit against the appellants the declarations of their co-conspirators, nor to fail to give the requested instruction.

## ELECTRONIC RECORDINGS AS EVIDENCE

Three electronic recordings of conversations were received in evidence over appellants' objection.

■ The Daly-Leonard conversation on May 14, 1959, was recorded by two independent methods. Leonard was equipped with a Minifon, a miniature wire recording device. The wire recording made on Leonard's person by this method was received in evidence. Leonard also was equipped with a miniature radio transmitter. The conversation was picked up in a neighboring room through a radio receiver and was there recorded on tape.

Appellants contend that these exhibits were inadmissible since they were secured in violation of the Fourth Amendment. They assert that Leonard obtained access to Daly's room under false pretenses amounting to an unlawful search and seizure.

We have held to the contrary upon this point in Todisco v. United States, 9 Cir., 1961, 298 F.2d 208, cert. den., 1962, 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527. Appellants request us to re-examine our decision in that case and overrule it. We decline and adhere to our opinion as there expressed.[27]

■ Appellants further claim that these exhibits were inadmissible because secured contrary to 47 U.S.C. § 301, which provides that "no person shall use or operate any apparatus for the transmission of * * * communications * * * by radio * * * except * * * with a license in that behalf * * *." Although Leonard had no license, "no policy against admission of evidence secured by the radio operation can be said to arise from such lack." Todisco v. United States, supra, 298 F.2d at page 211.

On May 5, 1959, Palermo telephoned Leonard at his home and attempted to persuade him to come to a restaurant where Palermo and Sica were waiting for him. Palermo told Leonard that he had been contacted by Carbo and that he and Leonard had to place a call to Gibson. This conversation with Palermo was recorded by Leonard with the aid of a Los Angeles police officer through an induction coil placed beside Leonard's home telephone.

25. In Schmeller v. United States, 6 Cir., 1944, 143 F.2d 544, hearsay documents had been admitted in absence of an establishment of a prima facie case by independent evidence. The court agreed with defendants that the jury should not rightly have considered the hearsay evidence, but instead of noting error in the judge's failure to remove the evidence from jury consideration by an erasure instruction when the necessary showing had not been made, the court placed the blame on the judge's failure to instruct the jury to try the admissibility point for themselves. We cannot agree with this solution. When no prima facie case is made out, the rights of the defendants can hardly be protected by permitting the jury to find that the evidence was nonetheless admissible.

26. Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, dealt with declarations not in furtherance of the conspiracy, which, it is well recognized, are limited in their application to the declarer alone. Oras v. United States, 9 Cir., 1933, 67 F.2d 463, where an instruction was held erroneous, involved lack of a prima facie case aliunde the declaration.

27. Accordingly, we find it unnecessary to discuss the question of whether these appellants have standing to assert a violation of Daly's constitutional rights.

■ Appellants contend that this recording was inadmissible in evidence since it constituted a violation of 47 U.S.C. § 605.[28] We disagree.

In Rathbun v. United States, 1957, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, it was held that the contents of a conversation overheard on a regularly used telephone extension with the consent of one party to the conversation did not constitute an unauthorized interception.

Appellants would distinguish Rathbun upon the ground that use of an induction coil constitutes, mechanically, a physical interception which is not the case with a regularly used extension phone. Again we disagree. As the record demonstrates, the induction coil is placed against the side of the telephone instrument where it serves as a listening device much in the nature of a tuning fork. There is no physical connection with or interruption of the telephone electrical circuit.[29]

But further, we do not understand that the mechanical nature of the method of overhearing is now to be the guidepost in this area. The controlling principles, it would seem, are substantially the same as those which guided us in Todisco.

In Rathbun, 355 U.S. at page 110, 78 S.Ct. at page 163, 2 L.Ed.2d 134, it is stated:

"The clear inference [from the language of § 605] is that one entitled to receive the communication may use it for his own benefit or have another use it for him. The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone. It has been conceded by those who believe the conduct here violates Section 605 that either party may record the conversation and publish it. The conduct of the party would differ in no way if instead of repeating the message he held out his handset so that another could hear out of it. We see no distinction between that sort of action and permitting an outsider to use an extension telephone for the same purpose."

We find no distinction between holding out the handset and permitting an outsider to hear through the use of an induction coil.[30]

Nor does the recording of this legally overheard conversation render the overhearing and divulging of the conversation improper.[31]

We conclude that it was not error to receive these recordings in evidence.

## SICA'S UNDERWORLD REPUTATION

■ Sica moved to dismiss the indictment against him (Counts 1 and 5) for the reason that he was unduly prejudiced by the charge in Paragraph 3(c) (see footnotes 4 and 5) that the conspir-

---

28. "* * * no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * * and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto * * *."

29. Appellants further suggest that use of the induction coil violates some regulation of the Federal Communications Commission. No objection on this basis was made at trial and we are not referred to the regulation in question.

30. See Ferguson v. United States, 10 Cir., 1962, 307 F.2d 787; Carnes v. United States, 5 Cir., 1962, 295 F.2d 598, cert. den., 1962, 369 U.S. 861, 82 S.Ct. 949, 8 L.Ed.2d 19.

31. Carnes v. United States, supra, 295 F. 2d at page 602; see also Hall v. United States, 5 Cir., 1962, 308 F.2d 266, cert. den., 1963, 83 S.Ct. 507.

acy contemplated the use of "persons known to said victim to have underworld reputations and to possess the necessary power to execute the conspirators' demands by force and violence" and the enlistment of Sica for this purpose. The motion was denied. Sica also objected to the introduction of testimony by Leonard and Nesseth to the effect that by reputation they knew of Sica as an "underworld" man and a "strong-arm" man. The objection was overruled. Sica assigns error in these respects.

In discussing the admissibility of evidence of bad moral character the Supreme Court in Michelson v. United States, 1948, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168, states:

"Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, Greer v. United States, 245 U.S. 559 [38 S.Ct. 209, 62 L.Ed. 469], but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny

him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." [32]

The subjects of confusion of issues and unfair surprise will be discussed later.

Whether in this case prejudice was undue would seem to us to depend upon the purpose served by the charge, and the issue to which the prejudicial evidence was relevant, and a consideration of the probability of harm to the defendant in the light of these facts.

The nature of Sica's reputation was not introduced into the case for the purpose of characterizing him as a bad man likely to resort to the conduct with which he is charged. This was not the source of its relevance.

Instead the prosecution relied on the reputation of Sica as a probative fact enabling the jury to infer that Sica had intervened with Leonard and Nesseth knowing that his presence would instill fear in them and intending to manipulate this fear for the benefit of Carbo and Palermo; and further, to conclude that Carbo and Palermo had secured Sica's participation with full realization that his effectiveness was based upon the fear his reputation could inspire in the victims.

In cases of extortion based upon fear of violence the facts of fear, actual or anticipated, and of its reasonableness, are vital factors. To prove a substantive act of extortion it is essential to show the generation of fear in the victim.[33]

---

32. See also: 1 Wigmore, Evidence, 3d Ed., 1940, §§ 55, 57; Uniform Rules of Evidence, Rule 47; Model Code of Evidence, Rule 306(1).

33. Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182, 188–190, cert. den., 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249, rehearing den., 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290; Nick v. United States, 8 Cir., 1941, 122 F.2d 660, 671, cert. den., 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, rehearing den., 314 U.S. 715, 62 S.Ct. 411, 86 L.Ed. 570, reh. den., 316 U.S. 710, 62 S.Ct. 1103, 86 L.Ed. 1776. See United States v. Compagna, 2 Cir., 1944, 146 F. 2d 524, 528, cert. den., 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422, rehearing den., 325 U.S. 892, 65 S.Ct. 1084, 89 L.Ed. 2004.

To prove a substantive act of attempted extortion it is necessary to prove an attempt to instill fear. To prove a conspiracy to extort it is necessary to show a plan to instill fear.

Here Sica stood in the position of a dangerous weapon to be used to strike fear into the hearts of Leonard and Nesseth. It was part of the prosecution's case to charge and to prove that the conspirators considered Sica to occupy this position. That Leonard and Nesseth considered him to be dangerous and that fear reasonably resulted from his appearance because of his reputation constituted relevant facts upon this part of the prosecution's case. " * * * there is a rational connection between the existence of the criminal agreement —the 'partnership in crime'—and the fact that the acts upon which the conspirators agreed, when carried out, had the expected effect upon those against whom they were directed * * *." United States v. Compagna, 2 Cir., 1944, 146 F.2d 524, 528, cert. den., 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945), reh. den., 325 U.S. 892, 65 S.Ct. 1084, 89 L.Ed. 2004 (1945).[34]

It is true that (despite the precautionary steps taken by the judge as later discussed) the jury may have permitted this evidence to bear upon the probability of Sica's guilt. The question is whether this possibility renders such evidence unduly prejudicial and inadmissible. If so, the United States is precluded from establishing a material part of its case.

The question then is not whether the United States may use Sica's reputation as a sword against him, but whether he may himself make use of it as a shield to immunize himself from proof of the means by which the conspirators planned to frighten their victims into submission. If he may, then all who are known to live by violence are free to extort by the tacit threat of violence conveyed by their reputations; for the reasonableness of the resulting fear, as determined by its cause, may not be presented to the jury.

We cannot accept this result as a sound balance of the conflicting interests involved.

This, in our judgment (with such safeguards as were taken by the trial judge), is a proper case for application of what has been termed the "multiple admissibility doctrine." As stated in 1 Wigmore, Evidence (3d Ed., 1940) § 13, page 300:

"When an evidentiary fact is offered for one purpose, and becomes admissible by satisfying all the rules applicable to it in that capacity, it is not inadmissible because it does

34. In this case Judge Learned Hand, disagreeing with the majority of the court, found the fact of fear irrelevant in a conspiracy case, although agreeing to its relevance in a case of substantive extortion. It does not appear from that case, however, that the plan of the conspirators was to instill fear in their victims. The opinion states, 146 F.2d at page 526: "So far as appears, they did not expressly threaten violence, but confined themselves to a pretense of union activity; that is, they threatened to call strikes against their victims unless they were plentifully paid." Judge Hand was of the view that evidence of the victim's fear of acts of violence incidental to the strike was irrelevant and inadmissible in absence of any showing that this fear was communicated to the conspirators.

Accepting that Judge Hand's minority view might have merit under the circumstances of that case, the situation appears entirely distinguishable from that at bar.

Here it is charged that fear of Sica was intended to serve as the very source of coercive power and the use of west coast enforcers had been expressly threatened. Furthermore, the victims' fearful states of mind here were fully disclosed to every one of the conspirators. Gibson from the outset knew that Leonard and Nesseth were apprehensive that Carbo and Palermo would resort to force and was requested by Leonard to intervene after Sica entered the picture. Palermo admitted knowledge that Leonard and his wife were frightened. Sica, himself, noting Leonard was taken aback by his presence, had asked Leonard whether "you feel there's some type of repercussions by me coming in here?"

not satisfy the rules applicable to it in some other capacity, and because the jury might improperly consider it in the latter capacity. This doctrine, although involving certain risks, is indispensible as a practical rule."

In State v. Belisle, 1920, 79 N.H. 444, 111 A. 316, 317, this doctrine was applied. There defendant Lyman was charged with assault upon a policeman. The victim, Fox, had sought to defend himself by drawing a gun. To justify this defense he was permitted to testify that Lyman was, Fox believed, a man who would resort to force. The court stated:

"The argument that the disposition, character, and reputation of Lyman are not evidence that he assaulted Fox is sound. The difficulty with the defendant's case is that, while the evidence was not admissible for that purpose, it was clearly admissible to prove the reasonableness of the mode of defense from threatened attack adopted by Fox. As the evidence was admissible for some purpose, a general exception to it is unavailing."

To avoid confusion of issues and to foreclose the jury from using the reputation evidence to convict defendants on the "bad man" theory, the court below, upon admitting the testimony in question, instructed the jury as to the limited consideration which might be given.[35]

The subject was again dealt with in the court's charge to the jury. We have no doubt but that to the maximum extent possible, prejudice flowing from any confusion of issues by the jury was eliminated.

 There can be no question of unfair surprise. A pre-trial offer of proof upon this matter was made by the prosecution thirteen months before the trial commenced.

We conclude that the district court did not err in denying Sica's motion to dismiss the indictment or in admitting the evidence of Sica's reputation.

## ANONYMOUS THREATENING TELEPHONE CALLS

In our statement of the facts we have recounted the receipt by Don Chargin of an anonymous telephone call just prior to his leaving for Los Angeles in connection with negotiations with Leonard to take over the Hollywood Boxing and Wrestling Club. The caller warned Chargin to stay out of Hollywood.

 Appellants objected to this testimony as irrelevant for lack of connection to any of the appellants and highly prejudicial. After a considerable discussion of the objection out of the presence of the jury, the court concluded:

"I think the problem will be one for the jury. I have an ancillary problem, to properly instruct them. You are invited to submit instruc-

35. "* * * there is an old basic principle in American law respecting the trial of criminal cases, and that is that the reputation of a defendant is just not the thing in issue. You are trying a specific charge or a specific group of charges that are set forth in the indictment.

"Now, a person who is, generally speaking, a fine upstanding citizen might occasionally go out and commit an occasional crime, and a man who has a bad reputation might never commit one. He might not deserve the reputation, because reputation is something different from character. Character is the quality of person you are and reputation is what is believed in certain quarters regarding certain aspects of your life. It might be justified. It might not.

"So it would be very easy, unless the jury disciplines itself to consider the evidence for the purpose for which it is admitted, to get off on the track of whether or not a particular defendant has a reputation of a certain kind or other.

"Now, it is contended here by the Government that this witness Leonard was put in fear of Mr. Sica and I think they are entitled to show or have Mr. Leonard tell why he was afraid and to look at the situation to see if it was one which was reasonably calculated to produce that fear. But the reputation of Mr. Sica per se is not before you, except in this limited way."

tions on it, but the objections are overruled."

The jury was then advised by the court:

"The jury must of course bear in mind that the witness says this is anonymous. Now what's anonymous ordinarily in life doesn't mean much, but sometimes what is anonymous is anonymous in form and you can fit it into the context of things. Whether this is the first situation or the second is going to depend upon the total context of the case, and just don't go deciding the issue on it until you have heard all the evidence and the instructions." [36]

Admission of this testimony under the circumstances is assigned as error.

The fact that Chargin could not identify the speaker does not necessarily render this testimony inadmissible. If identity could be found by the jury from other circumstances, admission of the testimony was proper.

■■■ The issue of authenticity—the identity of the author of a particular item of evidence such as a document or phone call—is for the jury once a prima facie case of authorship is made out by the proponent of the evidence.[37] The connection between a telephone call and the caller may be established circumstantially.[38] The issue for the trial judge in determining whether the required

foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed by the proponent. The scope of appellate review upon this issue is confined to determining whether the admission constituted abuse of judicial discretion in determining that a prima facie case had been made out.[39]

Upon the record we cannot say that the admission of this testimony constituted abuse of discretion.

Daly, a member of the conspiracy, had told Leonard that this warning would most likely be given by the conspirators and why. A month prior to the warning Sica had surreptitiously contacted Leonard's assistant and attempted to have him ascertain when Chargin planned to be in town and where he could be reached by telephone.

These facts, plus the manner in which the warning so obviously fitted into the conspiracy scheme, are sufficient to warrant reasonable men in concluding that the telephone call had been made by or at the direction of one of the conspirators in furtherance of the conspiracy, and thus, irrespective of the precise identity of the speaker, was binding on all appellants.

■■■ Appellants also assert as irrelevant and prejudicial Leonard's testimony

36. No instructions upon this subject were offered.

37. United States v. Tellier, 2 Cir., 1958, 255 F.2d 441, cert. den., 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958). See 7 Wigmore on Evidence, § 2135, McCormick on Evidence, § 194, Model Code of Evidence, Rule 601(a) (1942). That the procedure for handling the issue differs from that which we found proper with respect to declarations of co-conspirators is explained by the text writers. McCormick, supra at page 407, states: "It must be noticed, however, that authenticity is not to be classed as one of those preliminary questions of fact conditioning admissibility under technical evidentiary rules of competency or privilege. As to these latter, the trial judge will permit the adversary to introduce controverting proof on the preliminary issue in support of his objection, and the judge will decide this issue, without submission to the jury, as a basis for his ruling on admissibility. On the other hand, the authenticity of a writing or statement is not a question of the application of a technical rule of evidence. It goes to genuiness and relevance, as the jury can readily understand, and if a prima facie showing is made, the writing or statement comes in, with no opportunity then for evidence in denial. If evidence disputing genuineness is later given, the issue is for the jury."

38. Andrews v. United States, 10 Cir., 1935, 78 F.2d 274. See 7 Wigmore on Evidence, § 2155(1) (b).

39. See Wigmore on Evidence, § 2135 and cases cited therein; McCormick on Evidence, § 194.

744

to the effect that he had received threatening telephone calls between May 20 and November 1, 1959.

This testimony was given on redirect examination. On cross-examination appellants had attempted to impeach Leonard's credibility by showing that he had through his wife corruptly expressed a willingness to suppress his testimony and depart the country if he were paid $25,000.00.

On redirect examination the United States sought to explain this offer as founded not on corruption but on fear. The testimony of the threatening telephone calls was relevant to this issue and constituted a proper method of rehabilitating the witness.[40] The resulting prejudice was carefully minimized by the prosecution. The contents of the calls were not divulged to the jury.

We conclude that it was not error to permit testimony as to the anonymous threatening telephone calls.

### MISCELLANEOUS MATTERS OF EVIDENCE

Sica asserts as error the admission of testimony given by Leonard with reference to one Tom Stanley. Leonard testified that Stanley, a friend of Sica's, had called on him on occasions at about the time the indictments were handed down, seeking to persuade Leonard not to give testimony in appellants' trial. On two occasions Stanley had been accompanied by one Steve Calla. Stanley had stated to Leonard that Calla was a friend of Sica's and a convicted murderer. In Leonard's words, "He said Mr. Calla had been in the penitentiary in Cleveland for murder and I said 'Murder?' He said 'Yes, he beat them to death. He was a strong-arm man.'"

Sica contends that this testimony by Leonard of conversations had with Stanley constituted hearsay.

There can be no question but that the testimony was inadmissible for the purpose of establishing that what Stanley had said was true. It was not admitted for this purpose, however. Its purpose was to impeach and discredit Stanley as a witness.

Stanley had been called as a witness by Sica and had given testimony which, if believed, would have reflected upon the credibility of Leonard. The government sought to show bias and complicity upon Stanley's part; that even though he was not named as a co-conspirator, he was actively engaged in furthering the ends of the conspiracy.

Also, as in the case of the anonymous telephone threats to Leonard, the testimony had the purpose of showing Leonard's state of mind at a time when he was charged with having corruptly proposed to appellants that for a consideration he would avoid the giving of testimony by leaving the country.

In both these respects the testimony was relevant and competent.[41] The question was not whether what Stanley said was true but whether Stanley had said it. This was made clear by the court in an admonition to the jury.

We find no error in the admission of this testimony.

Sica charges the government with misconduct in asking on cross-examination whether he had been convicted of the crime of bookmaking.

On direct examination Sica had testified with respect to his felony record and had admitted to two convictions. On cross-examination he had admitted a third. He was then asked whether in 1951 he had been convicted of a conspiracy to violate certain sections of the Penal Code of California relative to bookmaking. In colloquy following objection by Sica's counsel, it appeared that although the exemplified copy of judg-

40. See Bracey v. United States, 79 U.S. App.D.C. 23, 142 F.2d 85, 89, cert. den., 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589; 4 Wigmore on Evidence, § 1119; McCormick on Evidence, § 49.

41. See 3 Wigmore on Evidence, §§ 948–949, 956, 960.

ment in the government's possession denominated the crime as a felony, a misdemeanor type of sentence had been imposed rendering the conviction one for misdemeanor.

Counsel for Sica then moved to strike the question and asked the court to instruct the jury to disregard it. This the court did to the express satisfaction of Sica's counsel, who conceded that the government apparently had acted in good faith. The following day Sica's counsel, reversing his judgment as to the good faith of the government, moved for mistrial. The motion was denied.

In our judgment, the court acted properly. We note that the question under attack never was answererd. We have difficulty finding any prejudice. Sica had admitted three felony convictions including robbery. A jury suspicion that he may also have been convicted of a misdemeanor would not seem to add measurably in the credibility balance. Furthermore, the admonition of the judge was clear and commanding and in our judgment was an adequate remedy.

We conclude that it was not error or abuse of discretion to deny Sica's motion for mistrial.

 Nesseth and one other witness, McCoy, were permitted over objection to testify to conversations had with Leonard, during which Leonard had recounted to them the threatening statements made to him by Carbo. Carbo asserts that this testimony was inadmissible as hearsay.

Leonard had already testified to the fact that these threats had been made. The testimony of Nesseth and McCoy was relevant proof of the state of mind of Leonard and of the effect which the threats had had upon him. It was competent evidence for this purpose and its admission was not error.

 Appellants assert error in the admission of testimony by Leonard as to

extortionate demands by Carbo not related to those here in issue. In our judgment, these were relevant in bearing upon intent and in showing Carbo's general plan or scheme to dominate the boxing field.[42]

· Carbo in his briefs has listed fifteen items of evidence which he contends were irrelevant and prejudicial. As to the bulk of these we do not regard them as irrelevant. To the extent that they were we find no prejudice. In any event, they did not form the basis of any assignment of error.

Appellants contend that evidence of the Daly-Leonard conversation should not have been admitted since that conversation did not serve to further the conspiracy. We think it obvious that it did.

## CHARGE TO THE JURY

 Rule 30, F.R.Cr.P., provides that any party may file requests for instructions and that "the court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed."

Appellants filed extensive requests for instructions. The district court advised appellants that he rejected all requests in the forms submitted because of their prolixity and confusing draftsmanship. He did not take issue with the propositions of law so presented, but refused to inform counsel as to the precise form his charge would take. Appellants assert that this is a violation of Rule 30 and reversible error.

Assuming arguendo that this constituted a violation of the rule as strictly read, we find no prejudice. The charge was proper, as we shall discuss. Appellants' arguments to the jury consumed four days and no suggestion has been given us as to how they might have been made more effective had the court fully and precisely disclosed the substance of

---

42. See Bush v. United States, 9 Cir., 1959, 267 F.2d 483, 489; 2 Wigmore on Evidence, §§ 300, 302, 304.

its charge. Therefore, we find no reversible error.[43]

▮ In one respect appellants were placed at a disadvantage by virtue of the court's method of procedure: It was rendered difficult for them to comply with the requirement of Rule 30 that error in the giving of instructions may not be asserted unless objection is made before the jury retires to consider its verdict. The government here asserts that appellants are foreclosed by this provision of the rule from asserting error in the charge. In our judgment, this provision should not apply under such circumstances as we find here. We therefore proceed to a consideration of those errors assigned by appellants relative to the charge.

Appellant Gibson presented evidence of good character and assigns as error the district court's failure to instruct the jury that such evidence alone may create a reasonable doubt of guilt.

▮ Upon this proposition of law the circuits are divided. The Tenth (joined by the Seventh) holds in accordance with Gibson's contention.[44] The remaining circuits do not require any more than that the jury be freely permitted to consider character evidence along with all other evidence upon the issue of guilt.[45] Such is the rule in this circuit.[46]

It is in the interpretation of Edgington v. United States, 1896, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467, that the circuits appear to differ. There the Supreme Court stated, 164 U.S. at page 366, 17 S.Ct. at pages 73-74, 41 L.Ed. 467:

"Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is

that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

In support of Gibson's position, a dictum in Michelson v. United States, 1948, 335 U.S. 469, 476, 69 S.Ct. 213, 218-219, 93 L.Ed. 168, referring to the privilege of introducing character evidence states:

"This privilege is sometimes valuable to a defendant for this Court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts a jury in a proper case should be so instructed. Edgington v. United States, 164 U.S. 361 [17 S.Ct. 72, 41 L.Ed. 467]."

Edgington, however, did not say or suggest that character evidence is so highly probative that it must, upon penalty of reversal, be singled out from the bulk of the testimony for special treatment. In Edgington the court was faced with an instruction which confined the jury's consideration of character evidence to cases where the evidence was in conflict or where the rest of the evidence created a doubt of guilt. It held such limitation improper. It did not hold that the lack of limitation must be expressly pointed out to the jury.

▮ Here the district court charged: "The jury is entitled to consider whether a person having such a reputation would commit such an offense. It is all up to you and you are to integrate all of this evidence. You are to integrate all of these in-

---

**43.** Watada v. United States, 9 Cir., 1962, 301 F.2d 869, 870.

**44.** Peterson v. United States, 10 Cir., 1959, 268 F.2d 87.

**45.** See footnote 3 of the Peterson case, supra (our footnote 44) at page 89 of 268 P.2d.

**46.** Kaspar v. United States, 9 Cir., 1955, 225 F.2d 275, 278-279.

structions. Take nothing as an isolated matter. Consider the picture as a whole."

The court went further, however, even approaching Gibson's proposed instruction. It gave as an example a Governor of the State of New York accused of robbery and, with repeated reference to this example, pointed out that "it would be very, very unlikely that a person of that reputation would be out as a stickup man." It thus strongly suggested to the jury that it might find it improbable that a man of good reputation would commit a particular crime.[47]

Under the view of the law adopted by this court, the instructions upon this point were adequate.

▓ Appellants claimed that the trial court failed to make a finding that the defendants' activities complained of affected interstate commerce so as to sustain federal jurisdiction. The judge instructed the jury that "if boxing matches are in fact televised and television is sent into other states, that brings it within ambit of interstate commerce." This was sufficient.[48]

▓ Appellants assert error in the instruction relative to the necessity for proof of overt acts in order to establish conspiracy under § 371. The court charged

"It is necessary further that, in addition to the showing of the unlawful conspiracy or agreement, the Government prove to your satisfaction, beyond a reasonable doubt, that one or more of the overt acts described in the indictment was done by one or more of the defendants or at their direction or with their aid."

Appellants contend that it was error to tell the jury that an act done at the direction of the defendants or with their aid would satisfy the requirement.

We disagree. 18 U.S.C. § 2(b) recognizes the principle of criminal agency in the federal law. It provides:

"Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

Furthermore, an instruction in accordance with appellants' views was given elsewhere in the charge. While appellants contend that this constitutes at best a conflict between instructions, we find no prejudice resulting. Since both Carbo and Palermo were found guilty on their substantive counts, the jury clearly found that overt acts had been committed by these defendants on both conspiracy counts.

Appellants assert that an instruction on aiding and abetting was confusing. We do not find it so. They assert that the court failed to instruct clearly on reasonable doubt. We regard the charge as perfectly clear. They criticized the court's explanation of the division of functions between court and jury as tending to lull the jury into a sense that their responsibility was not final. We disagree. We find no merit in appellants' complaint that the court failed to define the term "underworld."

MISCELLANEOUS ASSIGNMENTS OF MISCONDUCT, VIOLATION OF DUE PROCESS AND OTHER MATTERS

▓ Appellants assert that they were denied due process because the prosecution permitted false evidence to go uncorrected.

Leonard was caught up in a falsehood with reference to his alleged solicitation of hush money from appellants. He testified that it was his wife and not he himself who had acted in this respect. A tape recording of a conversation between Leonard and Palermo, introduced

47. Compare Alverez v. United States, 9 Cir., 1960, 282 F.2d 435, 436.

48. Hulahan v. United States, 6 Cir., 1954, 214 F.2d 441, 445-446, cert. den., 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954).

by appellants, demonstrated the contrary. Appellants' position is that the government thus solicited false testimony and failed adequately to apprise the jury of the truth, relying on Napue v. Illinois, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217.

In that case denial of due process lay in the fact that the truth, known to the prosecution to be contrary to its witnesses' testimony, was never brought home to the jury. Here the truth, known to the defendants, was brought home to the jury in the most effective possible way. Furthermore, government counsel in argument to the jury conceded that Leonard was not testifying truthfully in this regard.

Defendants appear to be contending that when a government witness has been discredited in one respect, the United States is obligated to disown him. We disagree. When the falsity of testimony is brought home to the jury, it remains the jury's function to determine to what extent that witness' testimony is otherwise worthy of belief.

Gibson contends that he was promised that his indictment would be dismissed. We find no substantial or credible evidence tending to show such a promise. In other respects, appellants protest that there was misconduct and deprivation of fair trial; alleged distortion of evidence by the government in closing argument; permitting Nesseth and McCoy to sit before the bar of the court during closing arguments so that government counsel might point them out; the court's interrupting Carbo's counsel with questions during his argument. In none of these matters do we find merit.

Appellants contend that they have been denied due process and equal protection of the laws through denial of bail during trial. These contentions have already been made to this court in two prior appeals and there disposed of.[49]

■ Gibson, being of the colored race, asserts that unconstitutional discrimination occurred in the selection of the jury venire through systematic exclusion of Negroes. There was no proof of exclusion; only of the fact that out of fifty veniremen none was a Negro. Testimony of the clerk of the court as to the manner of selection effectively refuted this contention, and Gibson's offered proof of racial population statistics would not have been persuasive to the contrary. "Purposeful discrimination is not sustained by a showing that on a single grand jury the number of members of one race is less than that race's proportion of the eligible individuals." Akins v. Texas, 1945, 325 U.S. 398, 403, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692.[50]

■ Appellants contend that the district court's method of handling challenges to the jury violated Rule 24(b) in that it did not assure the defendant their minimum number of challenges. The district judge required each side simultaneously to submit their challenges in writing to the clerk. The same juror might thus have been challenged by both sides. This is not improper.[51]

■ Gibson asserts that he was allowed only one challenge as to the three alternate jurors while Rule 24(c) grants him two challenges. This matter, however, was never presented to the district court and must be considered as waived.

■ Gibson contends that he was improperly denied severance. We disagree. The substantive counts in which Gibson was not charged still constituted overt acts attributable to him on the two conspiracy counts in which he was charged.

49. Carbo v. United States, 9 Cir., 1961, 288 F.2d 282; Carbo v. United States, 9 Cir., 1961, 288 F.2d 686, cert. den., 1961, 365 U.S. 861, 81 S.Ct. 827, 5 L. Ed.2d 823.

50. See also Cassell v. Texas, 1950, 339 U.S. 282, 286–287, 70 S.Ct. 629, 94 L. Ed. 839.

51. Pointer v. United States, 1894, 151 U.S. 396, 412, 14 S.Ct. 410, 38 L.Ed. 208; Hanson v. United States, 9 Cir., 1959, 271 F.2d 791, 792–793.

## RULINGS OF THE SUCCESSOR JUDGE

Following trial and jury verdict and while motions for new trial by all appellants and a motion for acquittal by Appellant Dragna were pending before him, Judge Ernest A. Tolin, the trial judge, died. Judge George H. Boldt was assigned to succeed him. A supplemental motion for new trial was made by all appellants under Rule 25, F.R.Cr.P.,[52] upon the ground that judicial duties in the case could not be properly performed by a successor judge. All motions were denied and Judge Boldt proceeded to impose sentence. This is assigned as abuse of discretion.

Appellants rely heavily upon dicta in Connelly v. United States, 8 Cir., 1957, 249 F.2d 576, 580, cert. den., Caudle v. United States, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716 (1958), reh. den., 354 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1072 (1958), where, in upholding a successor judge's decision that he could properly proceed, the court stated:

> "There might well be a criminal case in which the testimony would be of such a character that a successor judge could not fairly pass upon the questions here presented. If the evidence of the government were denied and the question of the credibility of the government witnesses was a serious issue the conflict in the evidence and the question of the credibility of witnesses might be a matter of very serious consideration. However, in the instant case the evidence of the government was not of that character."

Appellants assert that this case is precisely of such character; that it depends almost in its entirety upon the testimony of Leonard and Nesseth, which was flatly contradicted by the appellants' witnesses in many material respects; that credibility of witnesses was of the essence of the case.

Accepting the statement in Connelly, we do not apprehend that where credibility of government witnesses is a serious issue it must follow ipso facto that a new trial must be had. In Bennett v. United States, 5 Cir., 1960, 285 F.2d 567, cert. den., 366 U.S. 911, 81 S.Ct. 1087, 6 L.Ed.2d 236 (1961), the court held that the successor judge acted properly in passing upon defendant's new trial motion and in sentencing him even though the facts were in dispute and the resolution of factual dispute by the jury was dependent upon demeanor.

Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence. We should be inclined to emphasize demeanor rather than credibility as the vital factor upon the question here presented. The inquiry then would seem to be as to how importantly demeanor appears to loom in making the necessary credibility determinations.

Here Judge Boldt, before ruling on the supplemental motions for new trial, spent more than three months in a careful study of the record. 7,500 pages of transcript were condensed by him into an abstract of 1,320 pages. He concluded, in his memorandum order:

> "On the whole record this court is fully satisfied every defendant was accorded a fair trial, free from prejudicial error, and that the evidence thoroughly supports the verdict in every essential particular as to each defendant. The contentions of defendants which entailed a most ex-

---

52. "If by reason of absence from the district, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial."

haustive consideration of the record and analysis of authority are those relating to the credibility of government witnesses, the admission in evidence of the recordings and their playing to the jury. The case against the defendants did not rest on the unsupported oral testimony of either Leonard or Nesseth or both. Their testimony, in all essential particulars, was fully and convincingly corroborated."

This conclusion with respect to the substance of the corroborating evidence was reiterated from the bench at the time of imposing sentence. At that time Judge Boldt also expressed his conviction, based upon actions and words of Judge Tolin, that Judge Tolin "had not the slightest doubt of the guilt of any of the defendants or of the credibility of the principal witnesses."

In the exercise of his discretion Judge Boldt has, in our view, concerned himself with the vital question. He has concluded, after most careful and conscientious study, that the corroboration Leonard and Nesseth received from other convincing evidence placed the government's case safely beyond demeanor impeachment and that Judge Tolin himself had not been disturbed by questions of credibility. His determination in this latter respect is reinforced, to some extent at least, by Judge Tolin's charge to the jury. He warned them to discount the effect fear and the courtroom atmosphere might have on witnesses and emphasized the virtue of appraising testimony by the manner in which it successfully integrated with other evidence.

We do not find abuse of discretion in the action of Judge Boldt in proceeding, as successor judge under Rule 25, to the completion of the judicial proceedings in the district court.

### DECISION

As to Appellant Carbo, judgment affirmed.

As to Appellant Palermo, judgment affirmed.

As to Appellant Gibson, judgment affirmed.

As to Appellant Sica, judgment upon Counts 1 and 4 affirmed. Judgment on Count 5 reversed and the case remanded with instructions that judgment on this count be set aside.

As to Appellant Dragna, judgment reversed and the case remanded with instructions that judgment be entered for this defendant.